**ZENITH RADIO CORPORATION**

v.

**MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., et al.**

**NATIONAL UNION ELECTRIC CORPORATION**

v.

**MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., et al.**

**In re JAPANESE ELECTRONIC PRODUCTS ANTITRUST LITIGATION.**

Civ. A. Nos. 74–2451, 74–3247 and M.D.L. No. 189.

United States District Court, E. D. Pennsylvania.

April 4, 1975.

Edwin P. Rome, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for plaintiffs.

Carl W. Schwarz, Metzger, Noble, Schwarz & Kempler, Washington, D. C., for moving defendants.

Carla A. Hills, Asst. Atty. General; Robert E. J. Curran, U. S. Atty.; Andrew P. Vance, Chief, Customs Section; and Wesley K. Caine, Civil Division, Dept. of Justice, for intervenor, United States.

## OPINION

HIGGINBOTHAM, District Judge.

### INTRODUCTION

National Union Electric Corporation filed the first of these two antitrust actions, here consolidated for co-ordinated pretrial proceedings pursuant to 28 U.S. C. § 1407, in the District of New Jersey on December 21, 1970. In Count I of its complaint, it charged defendants with violations of the Antidumping Act of 1916, 15 U.S.C. § 72. Soon thereafter,

certain defendants [1] moved to dismiss Count I on the ground that the Act in question is void for vagueness and therefore violative of the Due Process Clause of the Fifth Amendment. The matter was fully briefed, then argued before the Honorable Robert Shaw on January 10, 1972. As of November 25, 1974, however, the issue had not been decided. The delay was caused in large part by the deaths of Judge Shaw and of his successor as Judge in this case, the Honorable John J. Kitchen.

On September 20, 1974, in the Eastern District of Pennsylvania, Zenith Radio Corporation filed the second of these actions. With the exception of the particular goods involved, the allegations in Count VII of its complaint are virtually identical to those in Count I of the NUE complaint.

On November 25, 1974, the Judicial Panel on Multidistrict Litigation transferred the *NUE* action from the District of New Jersey to the Eastern District of Pennsylvania so that its pretrial proceedings might be co-ordinated with those in the *Zenith* action.

On January 2, 1975, certain of the defendants [2] in the *Zenith* action filed a motion to dismiss Count VII of the Zenith complaint on the same ground that the NUE defendants had raised with respect to Count I in that action. Once again, opposing counsel briefed the issue, which was then argued before this Court on February 18, 1975.

In both cases, the Government intervened pursuant to 28 U.S.C. § 2403 for the sole purpose of defending the constitutionality of the Antidumping Act of 1916, submitted briefs, and participated in oral argument.

Having been fully briefed and argued in both the *NUE* and *Zenith* cases, the issue of the constitutionality of the Antidumping Act of 1916 is now ripe for decision. For reasons that will hereinafter appear, I have concluded that the Act gives potential defendants fair warning that their conduct may violate its prohibitions. Since the Act is sufficiently specific to withstand constitutional scrutiny, defendants' motions to dismiss Count I of the NUE complaint and Count VII of the Zenith complaint must be denied.

## DISCUSSION

### A. PRELIMINARY CONSIDERATIONS.

In the instant motions, defendants attack the constitutionality of § 801 of the Revenue Act of 1916, commonly known as the Antidumping Act of 1916, 15 U. S.C. § 72. Defendants allege that the statute in question, because of its vagueness, is in irreconcilable conflict with the due process requirements of the Fifth Amendment to the Constitution of the United States.

In pertinent part, the challenged statute reads as follows:

"§ 72. Importation or sale of articles at less than market value or wholesale price.

"It shall be unlawful for any person importing or assisting in importing any articles from any foreign country into the United States, commonly and systematically to import, sell or cause

---

1. The moving defendants in the *NUE* action are:

 Hitachi Sales Corporation of America; Toshiba America, Inc.; Sharp Electronics Corporation; SONY Corporation; Mitsubishi International Corporation; SONY Corporation of America; Sanyo Electric, Inc.; Matsushita Electric Industrial Co., Ltd.; and Matsushita Electric Corporation of America.

2. The moving defendants in the *Zenith* action are:

 Tokyo Shibaura Electric Company, Ltd.; Toshiba America, Inc.; Matsushita Electric Corporation of America; Hitachi, Ltd.; Hitachi Kaden Hanbai Kabushiki Kaisha; Hitachi Sales Corporation of America; Sharp Corporation; Sharp Electronics Corporation; Mitsubishi Corporation; Mitsubishi International Corporation; Sanyo Electric Trading Co., Ltd.; Sanyo Electric, Inc.; SONY Corporation; SONY Corporation of America; and Quasar Electronics Corporation.

to be imported or sold such articles within the United States at a price substantially less than the actual market value or wholesale price of such articles, at the time of exportation to the United States, in the principal markets of the country of their production, or of other foreign countries to which they are commonly exported after adding to such market value or wholesale price, freight, duty, and other charges and expenses necessarily incident to the importation and sale thereof in the United States: *Provided,* That such act or acts be done with the intent of destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States, or of restraining or monopolizing any part of trade and commerce in such articles in the United States."

Though this statute has been in effect for almost sixty years, it has not yet been judicially interpreted. The sole reported opinion dealing with an action brought under the statute, *H. Wagner and Adler Co.* v. *Mali,* 74 F.2d 666 (2d Cir. 1935), addresses itself to a discovery motion. Defense counsel has represented that, according to the relevant court records, this case was settled by stipulation on July 30, 1935. The instant matter thus presents an issue of first impression.[3]

## B. THE VOID FOR VAGUENESS DOCTRINE.

■ Defendants base their challenge to the constitutionality of the Antidumping Act of 1916 on the doctrine of void for vagueness.[4] At the core of the doctrine is the principle that "criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." *United States* v. *National Dairy Products Corp.,* 372 U.S. 29, 32–33, 83 S.Ct. 594, 598, 9 L.Ed.2d 561 (1963); see *United States* v. *Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954). Though plaintiffs here seek a civil remedy, the Antidumping Act of 1916 is also a criminal statute. The same language on which plaintiffs ground their civil claim describes the criminal conduct forbidden by the Act. I need not now decide whether the same statutory language can be constitutionally valid as civil legislation, but unconstitutionally vague if applied in a criminal case. In the instant matter, I give the defendants the benefit of the doubt, and apply to the Antidumping Act of 1916 the void for vagueness test as it has been used to determine the validity of criminal statutes. Certainly, if the Act is constitutionally valid as a criminal statute, it would be constitutionally valid as a civil statute too.

■ Even though they may properly invoke the void for vagueness doctrine, defendants here carry a heavy burden, for a strong presumption of validity attaches to an Act of Congress. *United States* v. *Carolene Products Co.,* 304 U.S. 144, 152, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). The courts will consistently seek an interpretation which supports the constitutionality of Congressional legislation. *United States* v. *Rumely,* 345 U.S. 41, 47, 73 S.Ct. 543, 97 L.Ed. 770 (1953). An Act of Congress will not be summarily invalidated as vague simply because it is difficult to determine whether certain marginal offenses fall within its language. *Jordan* v. *De-George,* 341 U.S. 223, 231, 71 S.Ct. 703, 95 L.Ed. 886 (1951); *United States* v. *Petrillo,* 332 U.S. 1, 7, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947). A Congressional statute need not meet impossible stand-

---

3. The phenomenon is not unknown in these consolidated cases. See my opinion on the international application of § 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), filed March 21, 1975, 402 F.Supp. 244 (1975).

4. In a rare display of unanimity, plaintiffs, defendants and the intervenor have all cited with approval Professor Amsterdam's comprehensive treatment of this doctrine. See Amsterdam, "The Void for Vagueness Doctrine in the Supreme Court," 109 U. of Pa. L.Rev. 67 (1960).

ards of specificity. *Jordan* v. *DeGeorge, supra,* 341 U.S. at 231, 71 S.Ct. 703; *United States* v. *Petrillo, supra,* 332 U.S. at 7, 67 S.Ct. 1538. Nor must it itemize with particularity every possible variety of conduct that it proscribes. *United States* v. *Harriss,* 347 U.S. 612, 618, 74 S.Ct. 808, 98 L.Ed. 989 (1954). Given the inevitable limits on the specificity that Congress can build into a statute, a court can demand "no more than a reasonable degree of certainty" from an Act of Congress. *Boyce Motor Lines* v. *United States,* 342 U.S. 337, 340, 72 S. Ct. 329, 331, 96 L.Ed. 367 (1952). "Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." Id.

■ The defendants have insisted that a statute which permits a private treble damage action is retrospective and penal, and should be more strictly construed than a regulatory statute which is prospective and remedial. I do not reach this question of statutory construction, because I am convinced that a treble damage statute, no matter what its relation to so-called "remedial" statutes, is not to be more strictly construed than a criminal statute. In *United States* v. *National Dairy Products Corporation,* 372 U.S. 29, 83 S.Ct. 594, 9 L. Ed.2d 561 (1963), the case which controls my decision here, the Supreme Court did construe a criminal statute, § 3 of the Robinson-Patman Act, 15 U.S. C. § 13a, and sustained its constitutionality against a vagueness challenge. I decline to use a more exacting standard of scrutiny here.

The United States Court of Appeals for the Second Circuit spoke to this very issue in the context of the vagueness doctrine in *Kreutz* v. *Durning,* 69 F.2d 802 (2d Cir. 1934), when it upheld the constitutionality of an analogous statute, the Antidumping Act of 1921, 19 U.S.C. § 160 *et seq.,* which had been attacked as retroactive and uncertain. Writing for the unanimous panel, Judge Learned Hand said:

"Finally, we can see no grievance in the supposed retroactive feature of the act. It is quite true that an importer brings goods into the United States at his peril, that it may be found that he has been 'dumping'; and that that decision will follow the importation. All decisions in that sense are retroactive; but the constitutive factors on which the duty is reckoned are expressly referred to the time of exportation. That the importer may not know whether the Secretary will discover them, or choose to act upon them is nothing; he obviously takes his chances." 69 F.2d at 804.

Guided by these principles, which define the application of the void for vagueness doctrine and show clearly that the doctrine does not immunize potential defendants from the risk that their conduct may subsequently be judged illegal, I turn now to the statute itself.

## C. THE CHALLENGED STATUTORY TERMS.

Defendants concentrate their vagueness attack on four terms used in the statute: (1) "commonly and systematically"; (2) "substantially less"; (3) "actual market value or wholesale price"; and (4) "other charges and expenses necessarily incident to the importation and sale thereof in the United States." [5]

---

5. At oral argument on this motion, counsel for plaintiffs referred the Court to a computer survey of the United States Code commissioned by the Ohio Bar Association. (Pretrial Order No. 9 at 170). That survey reveals that the word "commonly" appears in 120 different statutes, that the word "incident" appears in 609 different statutes, that the word "necessarily" appears in 112 different statutes, that the word "necessary" appears in 8,331 different statutes, that the word "substantial" appears in 843 different statutes, that the phrase "substantially less" appears in nine different statutes, and the word "systematically" in seven. (Id.) I have not independently verified this information. If it is accurate, however, and if I were to accept defendants' arguments on

Defendants appear to believe that the terms used in the statute are not words but rather cabalistic signs, whose meaning is accessible only to the initiated. That is demonstrably not the case. Each of the words in question or the words from which they are immediately derived have standard dictionary definitions.[6]

■ After contending that the challenged statutory terms are, in themselves, impenetrably vague, defendants go on to make the novel and ingenious argument that when Congress qualifies an arguably vague term with a series of other arguably vague terms, the vagueness of the entire enactment increases in a geometric progression. (Pretrial Order No. 9 at 138.) A far more logical, though less imaginative, approach is to read the statute with the assumption that even arguably vague terms, when used in conjunction with each other and in a specific context, will receive a far more precise definition from each other and from that context than any one of them would enjoy if they had been considered in isolation. That is the approach I take here, and it leads me inexorably to the conclusion that the Antidumping Act of 1916 is not, as Winston Churchill once said of Russia and as defendants seem to suggest, "a riddle wrapped in a mystery inside an enigma." The challenged terms are nether vague in themselves nor vague in the specific context of the Act.

(1) "Commonly and Systematically."

■ These words need little explanation. Whatever is done "commonly" is done with considerable frequency, as a matter of general practice. Whatever is done "systematically" is done regularly, in a recurring pattern. While neither the plaintiffs nor the intervenor have referred me to any cases construing these terms, that is not surprising, for each word has a plain meaning that does not require judicial elucidation. What is surprising is the defendants' inability to grasp those meanings.

(2) "Substantially Less."

The concept of "substantiality" is scarcely a stranger to the body of federal economic statutes regulating anticompetitive conduct. Sections 2(a), 3, and 7 of the Clayton Act, 15 U.S.C. §§ 13(a), 14, and 18, all prohibit certain business practices when the effect of those practices is substantially to lessen competition in any line of commerce. The constitutionality of § 2(a) was sustained against a vagueness challenge in *Atlas Building Products Co.* v. *Diamond Block and Gravel Co.*, 269 F.2d 950 (10th Cir. 1959) *cert. denied*, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960). The constitutionality of § 3 was upheld in *United Shoe Machinery Corp.* v. *United States*, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922). Finally, in *United States* v. *E. I. duPont de Nemours and Co.*, 366 U.S. 316, 328–29, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961), the Supreme Court took the constitutionality of § 7 for granted and held that it was specifically and narrowly directed. Certainly, the calculation of a substantial price differential is no more difficult, and is likely to be far easier, than the calculation of a substantial lessening of competition. If "substantially to lessen competition" is not unconstitutionally vague, then neither is "substantially less."[7]

---

this motion, I would be implicitly urging Congress to undertake a wholesale revision of the United States Code.

6. See Webster's New Collegiate Dictionary (1974 ed.) at 227 ("common"), 1184 ("systematic"), 1161 ("substantial"), 659 ("less"), 12 ("actual"), 704 ("market value"), 1338 ("wholesale"), 913 ("price"), 767 ("necessarily"), 580 ("incident").

7. In other motions argued before this Court, certain of the moving defendants have contended that their contacts with the District of New Jersey and/or the Eastern District of Pennsylvania were "insubstantial." I was naturally surprised to hear them label "substantially" an "opinion word" whose meaning is inscrutable.

(3) "Actual Market Value or Wholesale Price."

I see no need to discuss the latter term, "wholesale price," which is surely familiar to the astute businessmen who are officers of defendant corporations.

The entire phrase in question was part of the customs law of the United States when the Antidumping Act of 1916 was enacted. In the Tariff Act of 1913, § III, para. R, 38 Stat. 114, it was defined as follows:

"* * * that such actual market value shall be held to be the price at which such merchandise is freely offered for sale to all purchasers in * * * [the principal markets of the country from whence exported], in the usual wholesale quantities, and the price which the seller, shipper, or owner would have received, and was willing to receive, for such merchandise when sold in the ordinary course of trade in the usual wholesale quantities, including the value of all cartons, cases, crates, boxes, sacks, casks, barrels, hogsheads, bottles, jars, demijohns, carboys, and other containers or coverings, whether holding liquids or solids, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States * * *."

Not only was the phrase defined in the tariff legislation in force when the 1916 Act became law, but it has also been applied in several decisions of the Court of Customs Appeals involving both the 1913 Tariff Act and earlier tariff statutes. See, e. g., *Lloyd Co. v. United States*, 9 Ct.Cust.App. 280 (1919); *United States v. Philips Co.*, 7 Ct.Cust. App. 497 (1917); *United States v. Francklyn*, 4 Ct.Cust.App. 54 (1913); *Ascher Co. v. United States*, 3 Ct.Cust. 327 (1912). In a 1919 report the Tariff Commission adverted to the well-recognized meaning that "actual market value" had acquired in customs administration in this country. United States Tariff Commission, *Dumping and Unfair Foreign Competition in the United States and Canada's Antidumping Law* (1919) at 31. Finally, in *Muser v. Magone*, 155 U.S. 240, 15 S.Ct. 77, 39 L.Ed. 135 (1894), the Supreme Court specifically endorsed a definition of "actual market value" that was virtually identical to that used in the 1913 tariff act. See also *In re Cliquot Champagne*, 70 U.S. (3 Wall.) 114, 18 L.Ed. 116 (1866). These authorities decisively refute defendants' contention that the meaning of "actual market value" is unascertainable.

Defendants have referred me to the Emergency Tariff Act of 1921, Ch. 14, Title III, § 303(a), 42 Stat. 15. That provision modified the definition of "actual market value of wholesale price" established by the Tariff Act of 1913, but excepted from the modification that term as it was used in the Antidumping Act of 1916. A Senate report on the 1921 Act then asserted that the term, when it appeared in the excepted statutes, meant "commercial value." S.Rep. 16, 67th Cong., 1st Sess. (1921) at 15. Defendants contend that the modification and the Senate interpretation thoroughly confuse the meaning of "actual market value or wholesale price" as the term appears in the 1916 Act. I disagree. That definition, derived from the 1913 Act, was not altered by the 1921 Act. The Senate report may have applied that definition to a new concept, "commercial value," but it left intact the meaning of "actual market value or wholesale price" as used in the 1916 Act.

Defendants' reliance on *Goodyear Tire & Rubber Co. v. United States*, 11 Ct. Cust.App. 351 (1922), is similarly misplaced. While the Court there did say that when a foreign manufacturer controls all prices and all distribution outlets for its goods in its own foreign market, the goods are not *freely* offered in that market, and do not have an "actual market value" for appraisement purposes, it did not hold that the goods could not be appraised. Instead, it merely directed that an alternate stand-

ard of appraisement be employed, the one specified by Paragraph L of Section III of the Tariff Act of 1913, namely, "the wholesale price for which such or similar merchandise was actually sold or freely offered for sale in the usual wholesale quantities in the open market in the United States." 11 Ct.Cust.App. at 357.

(4) "Other charges and expenses necessarily incident to the importation and sale."

Like "commonly and systematically," this phrase requires little comment. Its context is defined by the immediately preceding language in the statute, the words "freight" and "duty." Obviously, "freight" and "duty" are "charges and expenses necessarily incident to the importation" of goods into the United States. Thus, the "other charges and expenses" mentioned in the challenged phrase are terms whose meaning can be ascertained by a simple analogy with "freight" and "duty." Needless to say, those meanings are not, as defendants suggest, unfathomable.

Certainly the terms employed in the Antidumping Act of 1916 are no less specific than a variety of other terms whose constitutionality the Supreme Court has upheld when challenged on vagueness grounds. See *Cameron* v. *Johnson,* 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968) ("unreasonably interferes"); *Boyce Motor Lines, Inc.* v. *United States,* 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952) ("so far as practicable"); *Jordan* v. *DeGeorge,* 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951) ("moral turpitude"); *United States* v. *Petrillo,* 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947) ("in excess of the number of employees needed"); *Chaplinsky* v. *New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) ("offensive, derisive or annoying word"); *United States* v. *Ragen,* 314 U.S. 513, 62 S.Ct. 374, 86 L.Ed. 383 (1942) ("reasonable allowance"); *Gorin* v. *United States,* 312 U.S. 19, 61 S.Ct.

429, 85 L.Ed. 488 (1941) ("connected with or related to the national defense"); *Minnesota* v. *Probate Court,* 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940) ("phychopathic personality"); *Kay* v. *United States,* 303 U.S. 1, 58 S.Ct. 468, 82 L.Ed. 607 (1938) ("willfully overvalues any security"); *Old Dearborne Distributing Co.* v. *Seagram Distillers Corp.,* 299 U.S. 183, 57 S.Ct. 139, 81 L. Ed. 109 (1936) ("fair and open competition"); *United States* v. *Shreveport Grain & Elevator Co.,* 287 U.S. 77, 53 S. Ct. 42, 77 L.Ed. 175 (1932) ("reasonable variations shall be permitted"); *Sproles* v. *Binford,* 286 U.S. 374, 52 S.Ct. 581, 76 L.Ed. 1167 (1932) ("shortest practicable route"); *Bandini Petroleum Co.* v. *Superior Court,* 285 U.S. 8, 52 S.Ct. 103, 76 L.Ed. 136 (1931) ("unreasonable waste of natural gas"); *Baltimore & Ohio R.R.* v. *Groeger,* 266 U.S. 521, 45 S.Ct. 169, 69 L. Ed. 419 (1925) ("proper condition and safe to operate . . . without unnecessary peril"); *Mahler* v. *Eby,* 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549 (1924) ("undesirable residents"); *Edgar A. Levy Leasing Co.* v. *Siegel,* 258 U.S. 242, 42 S.Ct. 289, 66 L.Ed. 595 (1922) ("unjust and unreasonable" or "oppressive" rent); and *Omaechevarria* v. *Idaho,* 246 U.S. 343, 38 S.Ct. 323, 62 L. Ed. 763 (1918) ("range usually occupied by any cattle grower"). In each of these cases, there was, as always, an opportunity for "the fertile legal 'imagination [to] conjure up hypothetical cases in which the meaning of [disputed] terms will be in nice question.' *American Communications Ass'n* v. *Douds,* 339 U. S. 382, 412, 70 S.Ct. 674, 94 L.Ed. 925 (1950)." *Grayned* v. *City of Rockford,* 408 U.S. 104, 110 n. 15, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972). Yet in each case the Court sustained the constitutionality of the challenged statute.

## D. "DUMPING": A MEANINGFUL BUSINESS REFERENT.

Moreover, the phenomenon described by the terms of the 1916 Act has a

meaningful referent in business usage and practice. Professor Viner, an authority on whom plaintiffs, defendants and the intervenor alike rely, has defined that phenomenon, "dumping," as "price discrimination between purchasers in different national markets" (footnote omitted). J. Viner, *Dumping: A Problem in International Trade* at 4 (1966 ed.). The practice itself long outdated the passage of the Antidumping Act of 1916, see *id.* ch. III, IV, V, which clearly implies that Congress knew whereof it wrote when it enacted the statute.

The popular title of the Act is itself a further indication that the conduct described has a meaningful business referent. An economic regulatory statute could scarcely acquire the designation of an "antidumping" act unless the business community to which the statute was addressed knew what "dumping" was.

E. THE FUNCTION OF SPECIFIC INTENT.

The narrow drafting of the statute also increases its certainty. While it clearly refers to the general practice of dumping, it in fact applies only to dumping that occurs "commonly and systematically." And even that kind of dumping, which is marked by continuity and regularity, is not proscribed by the Act unless it is undertaken with a specific, predatory, anticompetitive intent.

 Significantly, in none of the various memoranda submitted by defendants in either the *NUE* or the *Zenith* cases have they given more than scant attention to the additional element of certainty incorporated into the statute by this specific intent requirement. Their approach has been to argue that the predatory intent requirement describes only a state of mind, that no violation of the Act takes place until that state of mind is accompanied by a definite course of conduct, and that the Act

itself does not adequately define the prohibited course of conduct. I am not persuaded by this argument. As I read the Act, it forbids regular, continued price discrimination between purchasers in different national markets whenever the discrimination is motivated by a desire to destroy competition. This, I submit, is a more than adequate definition of the conduct proscribed by the Act. It is, furthermore, a definition that "men of common intelligence" can readily understand. See *Connally* v. *General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

In *United States* v. *Ragen,* 314 U.S. 513, 524, 62 S.Ct. 374, 379, 86 L.Ed. 383 (1942), a case where the defendants assailed the constitutionality of § 145 of the Revenue Act of 1932, the Supreme Court made an observation that fully applies to the Antidumping Act of 1916: "On no construction can the statutory provisions here involved become a trap for those who act in good faith. A mind intent upon willful evasion is inconsistent with surprised innocence." A mind intent on the destruction of competition in an industry is likewise inconsistent with surprised innocence.

The foundation of defendants' position is the following proposition: "at the time that someone, whether a company or an individual, performs an act, he must have a reasonable basis for knowing whether that act was illegal or not." (Pretrial Order No. 9 at 132–33.) I accept that proposition. I simply cannot see how someone who acted with the predatory intent to destroy an industry in the United States would *not* have a reasonable basis for knowing that his act was illegal.

Defendants have repeatedly confused the predatory intent required by the Antidumping Act of 1916 with *scienter.* Predatory intent, however, is not *scienter.* Mr. Justice Clark pointed out the difference in *United States* v. *National*

*Dairy Products Corp.,* 372 U.S. 29, 35, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). The predatory intent requirement of Section 3 of the Robinson-Patman Act, which is virtually the same as the predatory intent requirement of 15 U.S.C. Section 72, was *more* specific than the *scienter* provision that saved the statute attacked in *Screws* v. *United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), from unconstitutional vagueness.

## F. THE *CONNALLY* AND *CHAMPLIN REFINING* TESTS.

Defendants are certainly right when they say that the due process test of *Connally* v. *General Construction Co., supra,* is alive and well in this Circuit, for that test was cited with approval in *United States* v. *Pennsylvania Industrial Chemical Corporation,* 461 F.2d 468, 477 (3d Cir. 1972). The test itself, however, is of little help to defendants. It provides that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally, supra,* 269 U.S. at 391, 46 S.Ct. at 127. In the instant case I do not find that the Antidumpting Act of 1916 violates "the first essential of due process of law," or, indeed, any essential of due process.[8] The conduct that it forbids is described in readily definable terms, and that conduct must be coupled with a specific predatory intent before the Act is violated.

Moreover, the *Connally* court cited with approval Mr. Chief Justice White's assertion in *United States* v. *L. Cohen Grocery Co.,* 255 U.S. 81, 92, 41 S.Ct.

298, 65 L.Ed. 516 (1921), that a statute was sufficiently certain when "for reasons found to result either from the text of the statutes involved or the subjects with which they dealt, a standard of some sort was afforded." 269 U.S. at 391–92, 46 S.Ct. at 128. That is precisely the case here. Both the language of the 1916 Antidumping Act and the subject with which it deals afford a standard that is sufficiently specific to satisfy the requirements of the Due Process Clause.

■ Defendants further argue, on the basis of *Champlin Refining Co.* v. *Corporation Commission of Oklahoma,* 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062 (1932), that to require them to make the calculations called for by the statute is to impose on them an intolerable burden which is itself violative of due process. This argument borders on the frivolous. The Act requires that defendants make comparatively few computations on the basis of data that is readily available to them; that is, their wholesale prices in Japan and the United States and the cost of shipping their products to the United States. The Act does *not* demand that defendants square the circle.[9]

## G. THE *NATIONAL DAIRY PRODUCTS* PRECEDENT.

The most instructive case in the entire area of vagueness challenges to federal economic regulatory legislation, and the case which controls my decision here, is *United States* v. *National Dairy Products Corporation, supra.* Defendants there were indicted under, *inter alia,* § 3 of the Robinson-Patman Act, 15 U.S.C. § 13a, which makes it a crime to sell goods at "unreasonably low prices

---

8. The directors and officers of defendant corporations are, one would imagine, able businessmen. It was therefore surprising to hear defense counsel fervently assert that these skilled corporate managers had been reduced to pure guesswork by the alleged vagueness of the 1916 Antidumping Act.

9. I do not deny that the determination of wholesale price levels may sometimes involve a complicated process. That process, however, is an integral part of defendants' regular course of business. It is not intolerably burdensome.

for the purpose of destroying competition or eliminating a competitor." The district court sustained defendants' attack on the constitutionality of the statute, and dismissed the § 3 counts. The Supreme Court reversed.

Mr. Justice Clark, writing for the majority, said that sales "below cost" without a legitimate commercial objective were sales at "unreasonably low prices" for the purposes of § 3, and were proscribed by that section if made in order to destroy competition. Relying on *Screws* v. *United States, supra,* he held that the additional element of predatory intent provided "further definition of the proscribed conduct." 372 U.S. at 35, 83 S.Ct. at 599. Indeed, Section 3 gave even more specific notice than the statute upheld in *Screws,* for it made elements of the crime not only "the intent to achieve a *result* . . . but also the *act* . . . done in furtherance of that design or purpose." *Id.* He concluded that "the necessary specificity of warning is afforded when, as here, separate, though related, statutory elements of prohibited activity come to focus on one course of conduct." *Id.*

The rationale of *National Dairy Products* is fully applicable to the instant case. There, Mr. Justice Clark acknowledged that "cost" was subject to differing calculations, and expressly declined to reach the issue of which method of cost calculation should be employed. The Court nevertheless held that the statutory prohibition of sales at "unreasonably low prices" could embrace sales "below cost," and that this prohibition, when read with the requirement of predatory intent, gave the defendants adequate warning that their conduct was illegal. The instant case is even more compelling, because the phrase "actual market value or wholesale price," under attack here, is considerably more definite than "cost." When read with the Act's requirement of specific intent, it too gives potential defendants fair warn-

ing that their conduct is illegal. As a result, the Antidumping Act of 1916 is not, as defendants allege, void for vagueness; it fully satisfies the requirements of the Due Process Clause of the Fifth Amendment.

Defendants here, like the defendants in *National Dairy Products,* rely primarily on *United States* v. *L. Cohen Grocery Co., supra. Cohen Grocery,* however, was found inapposite in *National Dairy Products;* it is similarly inapposite here. The Act challenged for vagueness in *Cohen Grocery* proscribed "any unjust or unreasonable rate or charge," and the charge in the indictment there merely echoed the language of the statute. As a result, the Court found that no "specific or definite" act had been either proscribed by the Act or alleged in the indictment. 255 U.S. at 89, 49 S.Ct. at 300. That is not the case here. The Antidumping Act of 1916 not only describes with ample specificity the conduct it forbids, but also adds the further clarifying element of predatory intent. In *Cohen Grocery,* moreover, the standard established by the challenged statute "was without a meaningful referent in business practice or usage." *National Dairy Products, supra,* 372 U.S. at 36, 83 S.Ct. at 599. Again, that is not the case here, for the conduct proscribed by the Act does have a "meaningful referent in business practice or usage," the phenomenon of "dumping." Defendants' reliance on *Cohen Grocery* is clearly misplaced.

The same is true of their reliance on cases which sustained void-for-vagueness challenges to statutes on First Amendment grounds. Mr. Justice Clark distinguished those cases in *National Dairy Products;* they are also distinguishable here. In the context of the First Amendment, a vague statute may deter constitutionally protected conduct. See *NAACP* v. *Button,* 371 U.S. 415, 83 S. Ct. 328, 9 L.Ed.2d 405 (1963); *Thornhill* v. *Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). That is not

the case here, for the Antidumping Act of 1916, like § 3 of the Robinson-Patman Act, "is directed only at conduct designed to destroy competition, activity which is neither constitutionally protected nor socially desirable." *National Dairy Products, supra,* 372 U.S. at 36, 83 S.Ct at 600. The First Amendment vagueness cases are no more helpful to defendants here than *Cohen Grocery,* and *Cohen Grocery* is no help at all.

In light of these considerations, "[a] finding of unconstitutional uncertainty . . . would be a negation of experience and common sense." *United States v. Ragen, supra,* 314 U.S. at 524, 62 S. Ct. at 379. Accordingly, I hold that the Antidumping Act of 1916 is not unconstitutionally vague.

## CONCLUSION

Until these motions were briefed and argued, I had never before witnessed at close range a Dionysian intoxication with the creation of intellectual chaos and confusion where none need exist. Defendants' written and oral arguments have amply filled that prior gap in my experience. Throughout the proceedings on these motions, defense counsel have sought earnestly to prove themselves the Lamont Cranstons [10] of our common profession, that is, lawyers endowed with a singular ability to cloud men's minds. Their efforts, however, have ended in failure. For the reasons set forth above, I find that the Antidumping Act of 1916, which prohibits systematic price discrimination between purchasers in different national markets when the discrimination is practiced with a predatory intent, gives potential defendants adequate notice of the conduct it proscribes. The Act thus survives the constitutional scrutiny mandated by the Due Process Clause of the Fifth Amendment. Defendants' motions to dismiss Count I of the NUE complaint and Count VII of the Zenith complaint are therefore denied.

---

10. Mr. Cranston, the protagonist in a once popular radio series, was also known as "The Shadow."