**NATIONAL FOOTBALL LEAGUE, et al., Plaintiffs,**

v.

**RONDOR, INC., et al., Defendants.**

**No. 1:92CV2484.**

United States District Court, N.D. Ohio, E.D.

Dec. 30, 1993.

John Vanderstar, Neil K. Roman, Covington & Burling, Washington, DC, Thomas P. Meaney, Jr., Dan Leonard Makee, McDonald, Hopkins, Burke & Haber, Cleveland, OH, for National Football League, Cleveland Browns, Inc.

James E. Burns, Edward F. Siegel, Siegel & Associates, Shaker Heights, OH, William T. McGinty, Henry J. Hilow, McGinty & Hilow, Cleveland, OH, for Najahs French Creek Tavern, Inc., O.B.H. Investors, Inc., J.C.B. Corp., Josie G., Inc., McRizzo's, Inc., Success Management, Inc.

Kenneth R. Margolis, Case Western Reserve University, Cleveland, OH, for Jazel Co., Inc.

Frank J. Groh–Wargo, Wargo & Wargo, Berea, OH, for Mike & Jans Tavern, Inc.

Edward I. Stillman, Charles Edward Wagner, Stillman & Bartel, Cleveland, OH, David Peebles, for J. Rivers, Inc., 31635 Lorain Rd., Inc.

William V. Sweet, of counsel.

Brian Cook, for Najahs French Creek Tavern, Inc., Success Management, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MATIA, District Judge.

This action came on for trial before the Court from October 12, 1993, to October 15, 1993. The Court has considered all of the testimony of the witnesses, the demeanor and credibility of the witnesses on the stand, and evidence presented at the trial, as well as the entire record in this matter, and being otherwise advised in the premises, herein enters its findings of fact and conclusions of law.

### FINDINGS OF FACT

A. *The Parties*

1. The plaintiffs are the National Football League ("NFL" or "League") and the Cleveland Browns, Inc. ("Browns").

2. The defendants are Najahs French Creek Tavern, Inc., dba French Creek Tavern ("French Creek"); Success Management, Inc., dba Tijuana Taxi Club ("Tijuana Taxi"); Jazel Co., Inc. dba J.P.'s, A Sports Bar & Grille ("J.P.'s"); 31635 Lorain Road, Inc. dba Fuzzy's ("Fuzzy's"); and, J. Rivers Inc. dba Brother's Lounge ("Brother's").

3. Plaintiff NFL is an unincorporated, nonprofit association organized under the laws of the State of New York, and its principal place of business is located at 410 Park Avenue, New York, New York. The NFL is composed of 28 member clubs that are engaged in the business of exhibiting professional football games.

4. Plaintiff Browns is a Delaware corporation with its principal place of business at 80 First Avenue, Berea, Ohio. It holds the NFL franchise for the City of Cleveland and is a member club of the NFL. The home games of the Browns are played at the Cleveland Municipal Stadium, Cleveland, Ohio.

5. Defendant French Creek is an Ohio corporation located at 37040 Detroit Road, Avon, Ohio. French Creek operates a restaurant and bar business with a fire-code capacity of 320 persons and a seating capacity of approximately 130 persons.

6. Defendant Tijuana Taxi is an Ohio corporation located at 25973 Great Northern Boulevard, North Olmsted, Ohio. Tijuana Taxi operates a restaurant and lounge with a seating capacity of 250 persons.

7. Defendant J.P.'s is an Ohio corporation located at 24600 Detroit Road, Westlake, Ohio. J.P.'s operates a restaurant and bar with a fire-code capacity of 200 persons and a seating capacity of approximately 150 persons.

8. Defendant Fuzzy's is an Ohio corporation located at 31635 Lorain Road, North Olmsted, Ohio. Fuzzy's operates a bar with a seating capacity of 60–70 persons.

9. Defendant Brother's is an Ohio corporation located at 11609 Detroit Avenue, Cleveland, Ohio. Brother's operates a bar and restaurant with a seating capacity of 102 persons.

B. *The NFL's Blackout Rule*

10. The NFL, on behalf of its twenty-eight (28) member clubs, has entered into exclusive broadcasting agreements with the three major television broadcasting networks, ABC, CBS and NBC, as well as with ESPN and TNT. The NBC contract provides that if a home game of a member club is not sold out at least 72 hours in advance of game time, the telecast of that game will not be broadcast by the network in the home territory of the member club except with the consent of both participating clubs. This provision is known as the "blackout rule."

11. Under the NFL's Constitution and Bylaws, the "home territory" of the Cleveland Browns is defined as the home city "and includes the surrounding territory to the extent of 75 miles in every direction from the exterior corporate limits of such city."

12. The affiliated stations that are subject to the "backout rule" as it applies to the Browns' home territory are identified in the NBC contract as follows: Cleveland stations WEWS (ABC affiliate); WJW (CBS affiliate); WKYC (NBC affiliate); Youngstown stations WYTV (ABC affiliate); WKBN (CBS affiliate); WFMJ (NBC affiliate); and Akron/Canton station WAKR (ABC affiliate).

C. *Notice*

13. On November 2, 1992, plaintiffs, by and through counsel, sent letters entitled "Advance Notice of Potential Infringement" to each defendant by Federal Express for next-day delivery. Each defendant received one of these letters.

14. The "Advance Notice of Potential Infringement" letters advised defendants of plaintiffs' ownership of copyright in the telecast of the game between the Browns and the San Diego Chargers on November 15, 1992, and of the telecast of the game between the Browns and the Chicago Bears on November 29, 1992. Specifically, the letters warned each defendant that should it "intercept and/or receive transmissions of Browns games not locally broadcast in the Cleveland area by use of a satellite dish, special antenna, or any other equipment or device not of a kind commonly used in private homes, the NFL will take appropriate legal action against you to enforce its rights."

D. *Public Performance*

15. On November 15, 1992, the Browns played the San Diego Chargers at the Cleveland Municipal Stadium. The game was not sold out.

16. The game between the Browns and the San Diego Chargers of November 15, 1992, was telecast live by NBC affiliates to other areas of the country, but was not broadcast by network affiliate stations listed for Cleveland in the NBC contract.

17. Despite receipt of the "Advance Notice of Potential Infringement" letters, each defendant received and displayed to its patrons the telecast of the Browns–San Diego Chargers game of November 15, 1992, by off-air antenna from the NBC affiliate in Toledo, Ohio (WTVG–Channel 13).

### E. Copyright Ownership and Registration

18. Plaintiffs are the owners of a copyright of the telecast of the Browns–San Diego Chargers game of November 15, 1992.

19. On December 7, 1992, the NFL registered with the United States Copyright Office a copyright in a videotape of the telecast by NBC of the game between the Browns and the San Diego Chargers on November 15, 1992. The Copyright Office subsequently issued a Certificate of Registration for the videotape.

### F. Subsequent Notice, Public Performances and Registrations

20. This lawsuit was filed on November 20, 1992.

21. The Browns' home game against the Chicago Bears of November 29, 1992, and the Browns' home game against the Cincinnati Bengals of December 6, 1992, were not telecast by the network affiliate stations listed for Cleveland in the NBC contract.

22. Each defendant received the telecast of the Browns–Bears game and the Browns–Bengals game by off-air antenna from network affiliates in Toledo, Ohio, and displayed the telecasts of such games to its patrons.

23. On December 7, 1992, the NFL registered with the United States Copyright Office a copyright in a videotape of the telecast by CBS of the game between the Browns and the Chicago Bears on November 29, 1992. The Copyright Office subsequently issued a Certificate of Registration for the videotape.

24. On February 7, 1993, the NFL registered with the United States Copyright Office a copyright in a videotape of the telecast by NBC of the game between the Browns and the Cincinnati Bengals on December 6, 1992. The Copyright Office subsequently is-sued a Certificate of Registration for the videotape.

### G. "Home System" Defense

25. Each defendant asserts that its off-air antenna system falls within the "home system" exemption to the Copyright Act. The "home system" exemption provides in relevant part that there is no infringement where reception is made "on a single receiving apparatus of a kind commonly used in private homes." 17 U.S.C. § 110(5).

26. Both Mr. Jack Hurray and Mr. Charles G. Perry, III, telecommunications experts, testified that none of defendants' antenna systems is of a kind commonly used in private homes.

27. In April and May of 1993, Mr. Hurray conducted a survey of the private homes nearest defendants' establishments to determine the types of antenna systems being used in those homes. Mr. Hurray conducted the survey first by inspecting the defendants' antenna systems and then comparing those systems to those of homes in the areas immediately surrounding each defendant's establishment. Mr. Hurray conducted this survey on foot in seven (7) different municipalities, including Cleveland, Avon, Westlake, North Olmsted, Strongsville, Lakewood and Fairview Park.

28. This comprehensive survey revealed the following: Of the 624 homes surveyed with an external antenna, 558 (89.4 percent) have a combination VHF/UHF antenna; 8 (1.4 percent) have eleven or more VHF elements; 62 (10.0 percent) have nine or more VHF elements; 14 (2.2 percent) have a VHF boom length of 10 feet or more; 74 (11.8 percent) have a VHF boom length of seven feet or more; 11 (1.8 percent) have a preamplifier; and 152 (24.4 percent) have a rotor.

29. Mr. Hurray subsequently conducted a second, expanded survey of the antenna systems being used on private homes on additional streets in the immediate areas surrounding each defendant's establishment.

30. This second survey revealed that of the additional 2,223 homes surveyed with an external antenna, 125 (5.6 percent) have an

external antenna with ten or more VHF elements or are otherwise properly classified as a "special design antenna."

31. An external antenna "of a kind commonly used in private homes" in the area surrounding defendants' establishments is a combination UHF/VHF antenna with 4 to 6 VHF elements, an approximate VHF boom length of 5 feet, no preamplifier, and no rotor.

32. Defendant French Creek has a combination VHF/UHF antenna with 9 VHF elements, an approximate VHF boom length of 7 feet, an 8–foot mast, and a rotor.

33. Defendant Tijuana Taxi has a separate VHF antenna with 11 VHF elements, an approximate VHF boom length of 10 feet, a 10–foot mast, and a rotor.

34. Defendant J.P.'s has a combination VHF/UHF antenna with 9 VHF elements, an approximate VHF boom length of 8 feet, a 10–foot mast, a preamplifier, and a rotor.

35. Defendant Fuzzy's has a combination VHF/UHF antenna with 13 VHF elements, an approximate VHF boom length of 10 feet, a 10–foot mast, a preamplifier, and a rotor.

36. Defendant Brother's has a separate VHF antenna with 19 VHF elements, an approximate VHF boom length of 12 feet, a 7–foot mast, a preamplifier, and a rotor.

37. Each defendant uses an antenna system properly characterized as "deepest fringe."

38. The use of longer antennas with more gain, mast mounted with a rotor and preamplifier, is more common in fringe areas than in urban areas.

39. None of the defendants needs an antenna larger than the "common" home antenna or a rotor or a preamplifier to receive all Cleveland area stations.

40. The Federal Communications Commission service contours for WTVG–Channel 13 Toledo show that the predicted useable reception of that station does not extend to Western Cuyahoga County where each of defendants' establishments is located.

41. These service contours take into account the power of the signal transmitted by the station, the height of the transmitting antenna, and the character of the surrounding terrain.

42. The Federal Communications Commission service contours for WTVG–Channel 13 Toledo indicate that it would be unusual for the average patron in any of defendants' establishments to be able to receive a satisfactory signal from WTVG–Channel 13 on an external antenna "of a kind commonly used in private homes" in the areas surrounding the establishments.

### H. *Estoppel*

43. Plaintiffs were not aware that any commercial establishments in the Cleveland area were showing blacked-out Browns games by use of rooftop antenna systems until immediately before plaintiffs filed suit in 1992. When plaintiffs were alerted to that possibility, they immediately sent warning letters to all suspected establishments clearly stating that plaintiffs viewed as infringing reception "use of a satellite dish, special antenna, *or* any other equipment or device not of a kind commonly used in private homes." (emphasis added.)

44. Plaintiffs were not aware of any blacked-out games being shown in Cleveland prior to 1991 other than "a couple of isolated incidents" that were addressed without resort to the courts.

45. Although two defendants, Tijuana Taxi and Brother's, claim to have communicated with plaintiffs or their representatives prior to the November 15, 1992 game, only the testimony of Tijuana Taxi owner Mark Montgomery is credible in this respect. Mr. Montgomery frankly acknowledged that the only advice he was given by counsel for plaintiffs was that, "if you had an antenna that was commonly used in private homes, that was acceptable." When Mr. Montgomery described Tijuana Taxi's antenna to counsel, counsel told him that "he [counsel] didn't know anything about makes or brands." At no time did counsel represent or misrepresent anything.

### I. *Misuse*

46. Plaintiffs use their copyright to support the League's blackout rule which is designed to increase ticket sales and bring big crowds of lively fans to the stadiums of the member clubs.

### J. *Willfulness*

47. The Court does not find that defendants' actions in showing the telecasts of the Browns–San Diego Chargers, Browns–Bears and Browns–Bengals football games to its patrons were willful violations of plaintiffs' rights or the Copyright Act.

## CONCLUSIONS OF LAW

### A. *Jurisdiction and Venue*

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.

2. Each defendant is located in this district, and the claims arose in this district. Venue in this Court is proper under 28 U.S.C. § 1391(b).

### B. *Copyright Infringement*

3. "In order to prove a case of copyright infringement, the Plaintiff must show (1) his ownership of a valid copyright and (2) copying by the Defendants of protectible expression." *See, e.g., Budish v. Gordon,* 784 F.Supp. 1320, 1332 (N.D.Ohio 1992) (citing *Wickham v. Knoxville Int'l Energy Exposition, Inc.,* 739 F.2d 1094 (6th Cir.1984)); *accord* M. Nimmer & D. Nimmer, 3 *Nimmer on Copyright* § 13.01 at 13–5 (1992).

4. In addition, "[i]n the case of a work consisting of sounds, images, or both, the first fixation of which is made simultaneously with its transmission," the copyright holder must serve written notice upon the infringer before fixation and register the work with the Copyright Office within three months of its first transmission. 17 U.S.C. § 411(b).

5. The NFL, on behalf of its twenty-eight (28) member teams, and the Browns (as to their games) own and control a valid, enforceable copyright in the subject telecast.

6. Each defendant publicly performed the copyrighted telecast.

7. Plaintiffs complied fully with the notice requirements of 17 U.S.C. § 411(b).

8. Plaintiffs complied fully with the registration requirements of 17 U.S.C. § 411(b).

9. Plaintiffs proved a *prima facie* case of copyright infringement.

### C. *Affirmative Defenses*

#### (i) *The "Home System" Exemption*

10. Each defendant has the burden of proving that its antenna system falls within the terms of the § 110(5) "home system" exemption. *Hickory Grove Music v. Andrews,* 749 F.Supp. 1031, 1037 (D.Mont.1990).

11. Each defendant must prove that its antenna system constitutes "a single receiving apparatus of a kind commonly used in private homes." *See* 17 U.S.C. § 110(5).

12. The test for determining whether an antenna system is "common" within the meaning of 17 U.S.C. § 110(5) is highly localized:

> [H]ow likely [is it that] the average patron who watches a blacked out game at one of the defendant restaurants [has] the ability to watch the same game at home?

*See Nat. Football League v. McBee & Bruno's, Inc.,* 792 F.2d 726, 731 (8th Cir.1986); *see also Zenith Radio Corp. v. Matsushita Elec. Industrial Co.,* 402 F.Supp. 251, 256 (E.D.Pa.), *petition denied,* 521 F.2d 1399 (3rd Cir.1975). ("[The word 'commonly' needs] little explanation. Whatever is done 'commonly' is done with considerable frequency as a matter of general practice.")

13. It is unlikely that the average patron in any of defendants' establishments is able to watch blacked out games at home.

14. All of defendants' antennas are substantially larger than those commonly used in private homes. In addition, the antennas of J.P.'s, Fuzzy's, and Brothers are augmented by "non-common" preamplifiers. Finally, both Tijuana Taxi and Brothers have a "non-common" separate VHF antenna.

15. As the Court held in its Memorandum of Opinion and Order granting plaintiffs' motion for a preliminary injunction (Doc. # 50), defendants' evidence shows that the various

components of their antenna systems are *available* for use in private homes, but does *not* show that their antenna systems are "commonly *used* in private homes." (emphasis added.)

16. The Court therefore concludes that none of the defendants has met its burden of proving that its antenna system falls within the terms of the § 110(5) "home system" exemption.

### (ii) *Estoppel*

17. " '[E]very fact essential to an estoppel must be clearly and satisfactorily proved by a preponderance of the evidence,' ... and each of [the] elements must be present to sustain this defense." *See Minnesota Mining & Mfg. Co. v. Blume*, 533 F.Supp. 493, 517 (S.D.Ohio 1979), *aff'd*, 684 F.2d 1166 (6th Cir.1982), *cert. denied*, 460 U.S. 1047, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983) and 461 U.S. 939, 103 S.Ct. 2110, 77 L.Ed.2d 314 (1983).

18. "[A]cquiescence is a personal defense which merely results in a loss of rights as against one defendant." *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1046 (4th Cir.1985); *accord* 3 J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31.14(3) (1992) at 31–73 ("[a]cquiescence is a personal defense not triggered by failure to sue others"), *Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir.1991) ("[a] plaintiff's failure to assert trademark rights against third parties is not relevant to the defense of laches or acquiescence").

19. Acquiescence "requires a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his ... rights against the defendants." *Elvis Presley Enterprises, supra*, at 894. In addition, the party to be estopped "must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe that it is so intended." 3 *Nimmer on Copyright* § 13.07 at 13–133–34.

20. There is a "strong presumption" of reasonableness accorded those who bring actions within the limitations period. *See*

*Sprinklets Water Center, Inc. v. McKesson Corp.*, 806 F.Supp. 656, 663 (E.D.Mich.1992) (citing *Elvis Presley Enterprises, supra*, at 894). The appropriate statute of limitations for civil infringement actions is set forth at 17 U.S.C. § 507(b) and provides as follows:

No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued.

There is no evidence that plaintiffs were aware of any infringing conduct by any of the defendants—or of any other establishment—extending back three years.

21. Defendants, French Creek, J.P.'s, and Fuzzy's presented no evidence that plaintiffs had ever been aware of any prior infringing conduct by them, and the acquiescence defense is therefore inapplicable as to them. Plaintiffs cannot as a matter of law acquiesce in conduct of which they are unaware.

22. Upon learning of earlier showings by the other two defendants, Tijuana Taxi and Brother's, of blacked-out games in late 1991, plaintiffs sent letters warning them to cease showing games by satellite dish antenna. There is no evidence that plaintiffs were aware that any commercial establishments in the Cleveland area, including Tijuana Taxi and Brother's, were showing blacked-out Browns games by use of a rooftop antenna until immediately before plaintiffs filed suit in 1992.

23. The Court therefore holds that all of the defendants failed to establish that plaintiffs "expressly or impliedly assured" them that they would not assert their rights under the copyright laws against them and that plaintiffs intended such reliance upon their conduct.

24. "[A]n estoppel operates on, or is effective as to, the parties to the transaction out of which it arises and their privies." *See* Am.Jur.2d *Estoppel and Waiver*, § 114 at 773; *see also* 31 C.J.S. Estoppel § 130 at 661 ("[a]n equitable estoppel may be claimed by a party or privy, but not by a stranger or volunteer"). "Also, by way of limitation, only those to whom a representation is made or who are intended to be influenced, and their

privies, may take advantage of an estoppel." 28 Am.Jur.2d *Estoppel and Waiver*, § 114 at 774.

■ 25. Only one defendant, Tijuana Taxi, presented credible evidence of communications with plaintiffs or their representatives and claims to have been misled by such communications.

26. Defendant Tijuana Taxi failed to sustain its burden of proving that it was misled as a result of such communications. Mr. Montgomery's own testimony on behalf of Tijuana Taxi reflects that no misrepresentations were made.

27. The Court therefore holds that all of the defendants have failed to meet their burden of proving their affirmative defenses of estoppel by misrepresentation.

### (iii) *Copyright Misuse*

28. The affirmative defense of copyright misuse "has not been recognized by the Sixth Circuit, nor has it been rejected by that court." *Budish v. Gordon*, 784 F.Supp. 1320, 1336 (N.D.Ohio 1992).

29. In its Memorandum of Opinion and Order issued on September 30, 1993 (Doc. # 118), this Court held that defendants were not entitled to summary judgment on the ground that plaintiffs misused their copyright in the telecasts.

■ 30. Plaintiffs, as copyright holders in NFL game telecasts, have elected not to license to the networks the right to telecast games in a club's home territory that are not sold out 72 hours before the game is to begin. Such limited license is clearly permitted by the copyright law. *Id.* at 5; *see also Fox Film Corp. v. Doyal*, 286 U.S. 123, 127, 52 S.Ct. 546, 546, 76 L.Ed. 1010 (1932); *Lawlor v. Natural Screen Service Corporation*, 270 F.2d 146, 154 (3rd Cir.1959), *cert. denied*, 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742 (1960); and *Zacchini v. Scripps–Howard Broadcasting Co.*, 433 U.S. 562, 575, 97 S.Ct. 2849, 2857, 53 L.Ed.2d 965 (1975).

31. Therefore, if there is an affirmative defense of copyright misuse, the Court holds that defendants have failed to prove its applicability in this case.

### D. *Injunctive Relief, Statutory Damages and Costs*

■ 32. Both the injunctive relief and statutory damages sought by plaintiffs are expressly authorized by the Copyright Act. *See* 17 U.S.C. §§ 502 and 504.

33. In light of defendants' failure to heed warnings and refusal to cease unlawful showings until enjoined by this Court, plaintiffs are entitled to a permanent injunction against each defendant.

34. Where, as here, plaintiffs have elected to recover statutory as opposed to actual damages, the Copyright Act vests considerable discretion in the Court. The Act provides that the amount of damages shall be "in a sum of not less than $500 or more than $20,000 as the court considers just." *See* 17 U.S.C. § 504(c)(1).

35. The Copyright Act further provides that if the Court finds that "infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $100,-000." 17 U.S.C. § 504(c)(2). In addition, "the court in its discretion may allow the recovery of full costs" and "a reasonable attorney's fee ... as part of the costs." 17 U.S.C. § 505.

36. Malice is not an essential element of "willfulness." *See, e.g., Broadcast Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 236 (5th Cir.1988).

37. Plaintiffs have not proven that the infringing conduct of each defendant was committed willfully.

38. The deterrence of future infringements is a legitimate purpose in assessing statutory damages:

> The statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct. The discretion of the court is wide enough to permit a resort to statutory damages for such purposes.

*See F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233, 73 S.Ct. 222, 225, 97 L.Ed. 276 (1952); *see also Chi–Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224,

1229 (7th Cir.1991) ("district courts enjoy wide discretion in awarding fees and may consider factors such as ... 'the efficacy of the damages as a deterrent to future copyright infringement.'") (citations omitted).

## MEMORANDUM OF OPINION

This Court has separately issued its Findings of Fact and Conclusions of Law in this case. The purpose of this Opinion is to explain why the Court ruled as it did on several key points, since this is apparently a case of first impression with respect to the type of equipment used by the defendant establishments.[1] The Court emphasizes that this Opinion is not intended to be comprehensive; many of the issues covered in the Findings of Fact and Conclusions of Law simply do not require elaboration.

### I.

■ This cause of action arises from a right given to plaintiffs by an act of Congress known as the Copyright Act. The Copyright Act protects "original works of authorship fixed in any tangible medium," including "motion pictures and other audiovisual works," 17 U.S.C. § 102(a). A live broadcast (of a football game, for example) is protected if a fixation (e.g., a videotape) is being made simultaneously with the transmission. 17 U.S.C. § 110.[2]

However, Section 110(5) of the Copyright Act specifies that no copyright liability can be imposed for "communication of a transmission embodying a performance ... by the public reception of the transmission on a single receiving apparatus of a kind commonly used in private homes...."

At the heart of the argument in this case is the meaning of this so-called "home use" exemption. Is the receiving apparatus used by the defendants in this case "of a kind commonly used in private homes"?

The legislative history of the 1976 Act is helpful in this regard. With respect to the "home use" exemption, the drafters said as follows:

the clause would exempt small commercial establishments whose proprietors merely bring onto their premises standard radio or television equipment and turn it on for their customers' enjoyment, but it would impose liability where the proprietor has a commercial 'sound system' installed or converts a standard home receiving apparatus ... into the equivalent of a commercial sound system.

H.R.Rep. No. 94–1476 at 87. 94th Cong., 2d Sess., reprinted in 1976 U.S.Code Cong. & Admin.News 5659, 5701. As formulated by the Eighth Circuit United States Court of Appeals in McBee & Bruno's, Inc., supra, the question is how likely the average patron who watches a blacked-out football game at one of the defendant establishments is to have the ability to go home and watch the same game? If it is likely, then the "home use" exemption applies. It is therefore necessary to examine the evidence presented to the Court.

### II.

■ Plaintiffs and defendants submitted evidence of surveys undertaken to attempt to establish their particular viewpoint as to whether the equipment used by defendants was of a kind commonly used in private homes. Not surprisingly, the surveys employed widely divergent methodology.

Defendants used a market researcher who conducted a telephone survey of a representative sample of 420 households in the 216 telephone area code area (out of an estimated 1.6 million households that have television). These households were asked three questions: (1) whether they had and used an outside antenna, (2) whether they were able to receive stations from five designated cities outside their local area, and (3) whether they have received blacked-out football games. Of the 420 households, 111 said they had and used an outside antenna. Of those 111, 44 said that they were able to receive stations

---

1. The use of satellite dishes has previously been found not to be within the "home use" exemption. Nat. Football League v. McBee & Bruno's, Inc., 792 F.2d 726 (8th Cir.1986).

2. Stipulations of Fact Nos. 27, 28 and 29 agree that the National Football League registered with the United States Copyright Office a videotape of each of the telecasts.

from outside their local area, and 15 of the 44 said that they had received blacked-out football games. From that data, the researcher projected that 57,000 households in the 216 area had received blacked-out football games.

Plaintiffs undertook a house-to-house visual survey within the neighborhoods in the general vicinities of the defendant establishments. Their surveyor was familiar with electronic equipment in general and with antennas specifically. His initial survey of 1,366 homes looked for external antennas,[3] rotors, and preamplifiers.[4] He found 624 antennas (558 of which were VHF/UHF antennas), 11 preamplifiers, and 152 rotors. Subsequently, an expanded survey of 4,776 homes was completed by automobile, of which 2,223 had exterior antennas. This witness categorized 125 of those as high performance or deep fringe [5] antennas, which he defined as antennas having 10 or more elements.[6] (Other witnesses testified to a somewhat lower number of elements as qualifying for deep fringe status; this variation is not essential to the Court's reasoning.)

The Court believes that both of these surveys have some validity, although the information sought for this litigation can best be determined from the actual viewing of residences and the type of external antenna attached thereto. However, the Court does not have to choose between these surveys because both support the conclusion reached by the Court—particularly when homes not having any external antenna are taken into account, as they must be for purposes of this inquiry.

Defendants have misperceived their task in this case. They have clearly established through testimony that the equipment they used to receive the blacked-out games is of a kind commonly *available* for use in private homes. But that is not what Section 110(5) of the Copyright Act requires. They must go beyond a showing that the equipment is available; they must establish that it is "of a kind commonly used in private homes." This

they have not done, whether one accepts the results of their survey (15 out of 420) or the results of plaintiffs' survey (125 out of 4,776). The totality of the evidence quite clearly shows that deep fringe antennas with preamplifiers and rotors are not commonly used in private homes.

### III.

With respect to the issue of damages, the Court does not find that defendants' actions were willful violations of plaintiffs' rights or of the Copyright Act. The equipment the defendants were using had not previously been judicially determined to be outside the scope of the home use exemption. Therefore, the Court will impose only the minimum damage award specified by law ($500.00 per violation). Plaintiffs are also entitled to the issuance of a permanent injunction against future violations.

### JUDGMENT ENTRY AND PERMANENT INJUNCTION

This action came on for trial before the Court upon the facts without a jury, and the issues having been duly tried, a decision having been duly rendered and Findings of Fact and Conclusions of Law and a separate Memorandum of Opinion having been filed,

It is Ordered and Adjudged that plaintiffs, the National Football League ("NFL" or League") and the Cleveland Browns, Inc. ("Browns"), recover as statutory damages from each defendant as follows:

Najahs French Creek Tavern, Inc., dba French Creek Tavern ("French Creek"): Five Hundred Dollars ($500.00);

Success Management, Inc., dba Tijuana Taxi Club ("Tijuana Taxi"): Five Hundred Dollars ($500.00);

Jazel Co., Inc. dba J.P.'s, A Sports Bar & Grille ("J.P.'s"): Five Hundred Dollars ($500.00);

31635 Lorain Road, Inc. dba Fuzzy's ("Fuzzy's"): Five Hundred Dollars ($500.00); and

J. Rivers Inc. dba Brother's Lounge ("Brother's"): Five Hundred Dollars ($500.00).

---

**3.** External antennas, for purposes of this survey, were defined as VHF antennas or VHF/UHF combination antennas.

**4.** All witnesses agreed that preamplifiers could be located inside the house and thus would not be visible to a door-to-door surveyor.

**5.** A high performance or deep fringe antenna is one that is able to pick up signals transmitted from a more distant location than a regular antenna can.

**6.** Elements are the rods on an antenna.

It is Further Ordered and Adjudged that the costs of this action are taxed against defendants, French Creek, Tijuana Taxi, J.P.'s, Fuzzy's and Brother's.

It is Further Ordered and Adjudged that defendants, French Creek, Tijuana Taxi, J.P.'s, Fuzzy's and Brother's, their respective officers, agents, employees, successors and assigns are hereby permanently enjoined from taking any action, directly or indirectly, to perform publicly, without written authorization from the League and the Browns, (except on a single receiving apparatus of a kind commonly used in private homes) any telecasts of blacked-out Browns' home games, the copyrights of which are owned by the League on behalf of its member clubs, including the Browns.

It is Further Ordered and Adjudged that the bond given by plaintiffs in the amount of Ten Thousand Dollars ($10,000.00) as security is released.

It is Further Ordered and Adjudged that any ruling on the allowance of attorneys' fees and/or the amount of costs taxed as to each defendant is reserved until such time as the Court receives an application therefor.