Armond **BUDISH**, Plaintiff,

v.

Harley **GORDON**, et al., Defendants.

No. 1:91CV0885.

United States District Court,
N.D. Ohio, E.D.

Feb. 4, 1992.

---

Kenneth R. Adamo, Jones, Day, Reavis & Pogue, Dennis R. Rose, Mark E. Staib, Hahn, Loeser & Parks, Cleveland, Ohio, for plaintiff, counter-defendant.

Thomas J. Collin, Thomas F. Zych, Sr., Thompson, Hine & Flory, Charles M. Rosenberg, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio, Lee Carl Bromberg, Kerry L. Timbers, Bromberg & Sunstein, Boston, Mass., John J. Sheehan, Jr., Sheehan & Sheehan, Samuel S. Pearlman, Arthur Joseph Tassi, III, Berick, Pearlman & Mills, David A. Schaefer, David W. Neel, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio, for defendants, counter-claimant, cross-defendant, cross-claimant.

## MEMORANDUM OPINION

BATCHELDER, Circuit Judge, sitting by designation.

Presently before the Court is the motion of Plaintiff, Armond Budish, for a preliminary injunction. A hearing on Plaintiff's motion for a preliminary injunction was held on September 30 through October 2, 1991, and was concluded on October 9, 1991.

At the outset of the hearing, the Court directed the parties to focus on the Tables in the books at issue here. Therefore, the Findings of Fact and Conclusions of Law set forth below reflect that emphasis.

## I. FINDINGS OF FACT

A. Introduction and Procedural Background

1. This is a copyright infringement action brought pursuant to Title I of the Copyright Act of 1976, 17 U.S.C. §§ 106, 501(b). Plaintiff, Armond D. Budish, has also brought claims for violation of the Lanham Act, 15 U.S.C. § 1125(a), and Ohio common law.

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and § 1338(a).

3. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391, 1400.

4. On May 31, 1991 Defendant Jane Daniel filed a motion to dismiss for lack of personal jurisdiction, and Defendants Daniel, Harley Gordon, and Financial Planning Institute, Inc. (collectively "Defendants"), moved to dismiss certain counts for failure to state a claim.

5. On September 12, 1991, this Court denied Daniel's motion to dismiss for lack of personal jurisdiction, denied the Defendants' motion to dismiss Budish's unfair competition and unfair trade practices, Lanham Act, and unjust enrichment claims, and granted Defendants' motion to dismiss Budish's right of attribution claim. Presently before this Court are Budish's copyright infringement claim, Lanham Act claim, and his state law unfair competition, unfair trade practices, and unjust enrichment claims.

6. Pursuant to this Court's Order of July 31, 1991, this matter was set for a hearing on Budish's Motion for a Preliminary Injunction with respect to Defendants Gordon, Daniel and Financial Planning Institute.

7. The hearing began on September 30, 1991, and concluded on October 9, 1991.

8. Budish offered the testimony of himself and Charles Pixley, and the testimony of Defendants Daniel and Gordon, as adverse witnesses. Budish also offered the deposition testimony of John Perry, who had worked for Defendants in the preparation of one of the allegedly infringing works. The Defendants called Harley Gordon and Alexander Bove, Jr.

B. The Parties

9. Armond Budish is an author, journalist and attorney at law in Cleveland, Ohio.

10. Harley Gordon is an attorney at law in Boston, Massachusetts.

11. Jane Daniel is a professional writer in Newton, Massachusetts.

12. Financial Planning Institute, Inc. is a Massachusetts corporation owned solely by Gordon and Daniel.

13. Daniel & Daniel is a business owned by Jane Daniel. Daniel & Daniel is in the business of marketing communications.

14. Budish and Gordon both practice elder law.

15. Elder law is a sub-specialty in the law, which deals with legal issues affecting the elderly.

16. One of the critical issues in the area of elder law is Medicaid Planning. Medicaid Planning is helping individuals to protect their assets from the costs of nursing-home care while using Medicaid to cover those costs.

### C. Factual Background

17. Budish is a nationally known expert in the area of Medicaid Planning.

18. Budish is also a journalist. Through his regularly-appearing column "You and the Law," Budish has informed readers of *The Plain Dealer,* published in Cleveland, Ohio, about their legal rights and responsibilities for almost ten years. Budish is also a contributing Editor to *Family Circle Magazine,* a national publication, and has written for leading magazines and newspapers around the country for a number of years on various topics.

19. Budish also writes, lectures, and has been interviewed widely both nationally and locally, particularly on the subject of Medicaid Planning. Budish has written on Medicaid Planning and other elder law issues for *Family Circle* magazine as well as for other national and local publications. Through these activities, Budish has devel-

oped and continues to develop a strong national reputation in the elder law field, particularly on the subject of Medicaid Planning.

20. Budish is the author of *Avoiding the Medicaid Trap: How to Beat the Catastrophic Cost of Nursing–Home Care* (*"The Medicaid Trap"*).[1] *The Medicaid Trap* was published in August of 1989. A revised and updated version of *The Medicaid Trap* was published in November of 1990. A paperback version of the revised and updated *The Medical Trap* was published in August of 1991.

21. As a result of his writing and publishing of *The Medicaid Trap,* Budish's reputation and legal practice has been expanded.

### D. Budish's Creation of *The Medicaid Trap*

22. In part as a result of his consumer writings, and, in part, due to personal circumstances, Budish became keenly aware of the significant financial problems facing older Americans and their families due to catastrophic nursing-home costs. Budish was aware of the absence of any book on Medicaid Planning which was directed to a national, lay audience.

23. In March 1987, he began work on a book designed to help elderly middle-class Americans and their families cope with these catastrophic nursing-home costs.

24. In writing *The Medicaid Trap,* Budish, *inter alia,* creatively selected and arranged the general topics which he felt best presented the problem of paying for nursing-home care and the alternative solutions for that problem. He creatively selected the details and specific topics within his arrangement of general topics, and organized and arranged those materials, created, organized and arranged certain ta-

---

**1.** The following terms will be used to identify the works at issue in this action: Budish's *Avoiding the Medicaid Trap: How to Beat the Catastrophic Cost of Nursing–Home Care* (*"The Medicaid Trap"*); Gordon, et al.'s *How to Protect Your Life Savings from Catastrophic Illness and Nursing Homes* 1990 edition (*"Life Savings I"*); and Gordon, et al.'s *How to Protect Your Life Savings from Catastrophic Illness and Nursing Homes* 1991 edition (*"Life Savings II"*). Two versions of *Life Savings I* exist: the first version, identified by the drawing of a maze which appears on the cover (Daniel Dep.Exh. 1) and the second version, having a substantially solid blue top and white bottom cover (Gordon Dep.Exh. 2).

bles, created the examples included in the text, and selected and executed the style and tone of writing, all to create *The Medicaid Trap*.

25. To make *The Medicaid Trap* useful and marketable to a national audience of elderly middle-class Americans and their families, it was important that the book contain factual information pertaining to each state's Medicaid rules and regulations because Medicaid, although federally-based, is administered separately by the states, and the states' rules and regulations may differ, one from another.

 E. Budish's Creation of Plaintiff's Tables [2]

26. In the course of his extensive research, Budish discovered a technical report prepared by the National Governors' Association Center for Policy Research entitled *Medicaid Eligibility for the Elderly in Need of Long Term Care*, written by Edward Neuschler (the "Governors' Report").

27. The Governors' Report is a lengthy, complex, technical 152–page document which sets forth factual information related to the state requirements and guidelines for Medicaid eligibility in 46 tables and charts accompanied by more than 350 footnotes.

28. In creating his Plaintiff's Tables for *The Medicaid Trap*, Budish selected certain factual information from the Governors' Report and organized that information along with information from other sources into eight original tables. Budish only used the Governors' Report as a source of certain factual information in creating the Plaintiff's Tables.

29. Budish asked for and received the permission of Edward Neuschler to use the factual information in the Governors' Report. (*See* Plaintiff's Exh. 8).

30. Budish exercised creative efforts in electing to present certain information in the form of tables, and in compiling, organizing, arranging and presenting the certain selected information he found in the Governors' Report, together with other information acquired through his research from other sources, into eight original tables in *The Medicaid Trap*.[3]

31. Budish obtained much of the underlying data for Plaintiff's Table 12 from information scattered throughout the Governors' Report and from certain information set forth in six separate tables in that Report (Tables B–7, B–8, B–9, B–10, B–11 and B–12). Budish's creative selection, ordering and arrangement of this information from the Governors' Report in preparing Plaintiff's Table 12 is demonstrated by the following:

 (a) Budish selected only eight categories of information to include in Plaintiff's Table 12, from the hundreds of information categories contained in the Governors' Report. The "B" section of the Governors' Report contained seventeen categories of information, nine of which Budish chose not to include in Plaintiff's Table 12. Seventeen categories of information could be organized logically in hundreds of different ways; Budish chose one arrangement from that range of possibilities. The Medicaid Regulations identify fifteen discrete categories of assets which are exempt, 20 C.F.R. § 416.1210. Even fifteen categories present hundreds of different options for an organized and logical selection and arrangement.

 (b) Tables B–7 through B–12 in the Governors' Report are difficult for a lay person to understand. Each of the six tables listed the criteria for Supplemental Security Income (SSI) and

---

**2.** The following terms will be used to discuss the tables at issue in this section: Tables 5 through 12 of *The Medicaid Trap* (the "Plaintiff's Tables"); Charts 2 through 8 of *Life Savings I* (the "Defendants' Tables") and Charts 2 through 4 and 6 through 8 of *Life Savings II* (the "Defendants' Revised Tables").

**3.** In order to illustrate his creative efforts Budish presented the Table Comparison Charts as an Exhibit to Plaintiff's Brief in Support of Motion for Preliminary Injunction. These Charts were also presented at the hearing through Budish's testimony.

then utilized three columns comparing states with criteria which are more restrictive, less restrictive, or the same as the SSI requirements. Budish created an entirely new organization in preparing Table 12, and composed in the process original, new headings for his table. Budish's Table 12 clearly and plainly states the asset limits without any use of or reference to the more complicated SSI rules.

(c) Budish created a new category for rings (not presented as a category in any of the six pertinent Governors' Report tables).

(d) Budish located and selected certain textual information provided in the footnotes and explanations in the Governors' Report tables and created tabular entries for Table 12. For example, all of the textual entries in Table 12 under the categories "Car," "Income–Producing Property," "Other Property for Support," and "Life Insurance" were located and selected from information in multitudinous and confusing footnotes and explanations to Governors' Report tables, but were not part of the tabular information in these tables.

(e) Budish created a footnote for Table 12 which explained the term "medically needy" which is used in the Table; that footnote was not in any of the Governors' Report tables.

32. Many of the facts in Plaintiff's Table 11 were obtained from Table 2 of the Governors' Report. Budish's creative selection, ordering and arrangement of the information from the Report together with information relating to lien laws resulting from Budish's own research in preparing Plaintiff's Table 11 is demonstrated by the following:

(a) The title of Governors' Report Table 2 was "Conditions for Continued Exclusion of the Home as a Resource for Institutionalized Individuals with No Spouse or Dependents." Budish created a table which is much more understandable, identified by the simple title, "Rules for Protecting a Person's House from a Nursing Home."

(b) Budish created new column headings, making them much more understandable than the headings used in the Report. For example, the heading for the third column in Budish's Table 11 is: "You Will be Protected Whether or Not You Return;" the column in the Governors' Report says: "Exclusion of the Home is Based On No Conditions; Exclusion is Gained Automatically."

(c) Budish excluded two categories of information that had been included in the Governors' Report table.

(d) Budish changed the type of entries in the columns for clarity of presentation, using "Xs" rather than textual entries as had been used in the Governors' Report (such as "Intent," "M.D. cert." and "Automatic").

(e) Plaintiff's Table 11 contained six footnotes; a comparison of Budish's footnotes and the Governors' Report footnotes clearly demonstrates Budish's creative selection, ordering and arrangement of this information. For example, Footnote C to Plaintiff's Table 11 discussed lien laws; although the text of the Governors' Report also contained a discussion of lien laws, nothing in Governors' Report Table 2 even mentioned lien laws.

33. The facts in Plaintiff's Table 10 were largely obtained from Governors' Report Table 1. Budish's creative selection, ordering and arrangement of this information in preparing Plaintiff's Table 10 is demonstrated by the following:

(a) The Governor's Report table bore the complex title: "Limits on Countable Resources for Aged INDIVIDUALS Seeking Medicaid Coverage of Nursing Home Care, 1987". Budish created a much more understandable table, identified by the simple title: "Amount of Assets a Person Can Protect from a Nursing Home."

(b) The Governors' Report table was broken into three columns based upon a reference to the "SSI Resource Stan-

dard." Budish made no reference to the SSI standard and presented the information in a much simpler two-column format which just lists amounts.

(c) Budish omitted the information presented in footnote 2 of the Governors' Report pertaining to "medically needy" programs, and incorporated the other information presented in footnotes to the Governors' Report into the body of Plaintiff's Table 10.

34. The facts contained in Plaintiff's Table 9 were largely obtained from Governors' Report Table 4, but were updated over those appearing in the Report. Budish's creative selection, ordering and arrangement of the information from the Governor's Report and information related to the home-maintenance allowance for certain states resulting from Budish's further research in preparing Plaintiff's Table 9 is demonstrated by the following:

(a) Budish created new titles, headings and formats in comparison to the information presented in the Governors' Report table, and achieved more understandability and clarity of presentation.

(b) The Governors' Report table combined information about both the Personal Needs Allowance and the Home Maintenance Allowance, which complicated the table. Budish presented these issues in two more readily understandable and readable tables.

(c) Budish included in his Plaintiff's Table only those states which provide a home maintenance allowance; the Governors' Report provided information for all states, which made the table harder to read.

(d) The Governors' Report presented explanatory information in extensive and complex footnotes. Budish selected certain information from these footnotes and incorporated it into the body of this Table.

(e) The footnotes in Plaintiff's Table 9 were created by Budish, and were not taken from the Governors' Report. Budish's first footnote summarized seven separate footnotes in the Governors' Report; Budish's second footnote rewrote and simplified two separate footnotes in Governors' Report Table 4.

35. The facts contained in Plaintiff's Table 8 were largely obtained from Governors' Report Table 4 but were updated over those appearing in the Report. Budish's creative selection, ordering and arrangement of the information found in the Governor's Report and information related to the specific personal needs allowance of certain states resulting from Budish's further research in preparing Plaintiff's Table 8 is demonstrated by the following:

(a) Budish created new titles, headings and formats in Plaintiff's Tables 8 in comparison to those of Governors' Report Table 4, and achieved more understandability and clarity of presentation.

(b) The Governors' Report table combined information about both the Personal Needs Allowance and the Home Maintenance Allowance, which complicated the table. Budish separated these issues in two more readily understandable and readable tables.

(c) The Governors' Report presented two columns of information concerning the Personal Needs Allowance; Budish selected the information for only one column and omitted the other, in creating Plaintiff's Table 4.

(d) Budish incorporated information from two of the Governors' Report Table 4 footnotes directly into his Table 8, and he omitted the rest of the lengthy footnotes from the Governors' Report.

36. The facts contained in Plaintiff's Tables 5, 6 and 7 were obtained largely from Governors' Report Table 3, but were updated over those appearing in the report. Budish's creative selection, ordering and arrangement of this information found in the Governor's Report and information related to income limits resulting from Budish's further research in preparing Plaintiff's Tables 5, 6 and 7 is demonstrated by the following:

(a) Governors' Report Table 3 was entitled "Limits on Monthly Income for Aged Individuals Seeking Medicaid Coverage of Nursing Home Care" and presented the limits (or lack of limits) for all states in one chart. The Governors' Report Table 3 broke down income limits for "Nursing Home Care [Only]" and "Any Medicaid Sources." Budish created his tables by constructing three more readily understandable and readable tables, one listing "States with No Limit on Income;" one listing "States with a $1062 Limit on Monthly Income;" and one listing "States with Monthly Income Limits Below $1062."

(b) Plaintiff's Tables 5 and 6 contain no dollar figures; Governors' Report Table 3 has many dollar figures listed.

(c) The Governors' Report Table 3 had a separate column concerning the application of income limits to gross or net income. Budish has no such column, but rather incorporates this information into the body and footnotes of his tables.

(d) Budish omitted many of the complicated footnotes to the Governors' Report Table 3 and created new footnotes for his tables.

37. Budish creatively selected, ordered and arranged the factual information in the Plaintiff's Tables.

38. Budish exercised creativity, resulting in an original work of authorship, in choosing the information to include in tables and the number of tables in which he placed that information in *The Medicaid Trap*. Budish's creative selection and arrangement is further demonstrated by a comparison of the different ways other authors have chosen to present the same or similar information in both textual and tabular form. Defendants' expert, Alexander Bove, Jr., admitted that the use of tables was not mandatory, or in his view necessary; that the use of all of the Plaintiff's Tables was not mandatory or required by the subject matter; and that textual formats would be proper to present such information.

39. After two-and-a-half years and hundreds of hours of research and writing, Budish's book was published in August 1989 by Henry Holt and Company.

F. *The Medicaid Trap*

40. *The Medicaid Trap* is an original work of authorship created by Budish.

41. *The Medicaid Trap* contains substantial material wholly original to Budish.

42. *The Medicaid Trap* was registered with the U.S. Copyright Office on October 24, 1989, Registration No. TX 27 05 504. (*See* Plaintiff's Exh. 10). All copies of *The Medicaid Trap*, in all versions, were published with proper copyright notice affixed.

43. *The Medicaid Trap* discusses Medicaid particularly as it relates to nursing home care, and specific Medicaid Planning techniques relating to the problem of paying for nursing home care without a catastrophic financial impact on the elderly resident and his/her spouse and their family.

44. Budish has introduced into evidence several books or portions of books which discuss the topics of Medicaid, Medicaid Planning, and nursing homes. (*See, e.g.,* Plaintiff's Exhs. 52, 53, 58, 72). These books, with some exceptions, are all directed to the same general audience as *The Medicaid Trap*—elderly middle-class Americans and their families. These books demonstrate the range of topics which the Medicaid subject area encompasses. These topics include the topics discussed in *The Medicaid Trap* and *Life Savings I* as well as: the Supplemental Security Income (SSI) and section 209(b) eligibility requirements; the medically needy; the categorically needy; the panoply of services Medicaid will cover; the differing levels of care; the quality of care; the range of benefits; the types of care available; home health care; the types of nursing homes; admission to nursing homes; quality of nursing homes; retroactive benefits; the spend-down period; deeming and reverse deeming; Medicaid liens and recoupment; and the "Pickle Amendment."

45. *The Medicaid Trap* is written for a national audience of elderly middle-class readers and their families. *The Medicaid Trap* was the first book devoted entirely to the topic of Medicaid Planning written for this audience.

46. In *The Medicaid Trap,* Budish presents selected topics specifically related to Medicaid Planning and the problem of paying for nursing-home care from the numerous topics available for discussion. Budish presented his selected topics in the following order: (a) a discussion of the problem of the cost of nursing-home care and the options for paying for such care, with anecdotal illustrations; (b) a discussion of the income and asset Medicaid eligibility rules, illustrated with examples, with factual information related to each state compiled in tabular format; (c) a discussion of the thirty-month rule pertaining to the effect of transfers of assets on Medicaid eligibility, with illustrative examples; (d) a discussion of Medicaid Planning techniques, with illustrative examples; (e) a discussion of durable powers of attorney and other legal instruments, with illustrative examples; (f) a discussion of divorce as a Medicaid Planning technique; (g) a discussion of long-term care insurance; (h) a discussion of living wills; and (i) a discussion concerning choosing a lawyer.

47. In *The Medicaid Trap* Budish included factual information and data in tables to make it more accessible to the lay reader.

48. The Plaintiff's Tables are an integral, substantial and material part of *The Medicaid Trap.*

### G. *Life Savings I*

49. No later than December of 1989, Defendants, Gordon and Daniel possessed (and read and marked-up) a copy of *The Medicaid Trap. The Medicaid Trap* was available to and used by Defendants Daniel and Gordon until *Life Savings I* was completed.

50. Defendants placed *Life Savings I* on the market in March of 1990.

51. *Life Savings I* discusses Medicaid particularly as it relates to nursing home care, and specific Medicaid Planning techniques related to the problem of paying for nursing-home care without a catastrophic impact on the elderly resident and his/her spouse and their family. With the exception of a discussion concerning negotiating with a nursing home, *Life Savings I* discusses no topic which is not discussed in *The Medicaid Trap.*

52. *Life Savings I* is aimed at the same audience as *The Medicaid Trap.* Were a member of this audience to read *Life Savings I* first, he probably would be disinclined to purchase or read *The Medicaid Trap.*

53. Throughout this litigation, Defendants continuously represented to Plaintiff and this Court that they did not copy the Defendants' Tables from *The Medicaid Trap,* but rather took them from the Governors' Report. For example, in his declaration dated May 10, 1991, Defendant Gordon represented to this Court that *Life Savings I* "includes charts of information from public sources, such as a report of the National Governors' Association, which sources are duly noted." Again in their depositions, Defendants Gordon and Daniel swore that they took their tables directly from the Governors' Report, not the original book. Finally, four weeks before the hearing, Defendants in their responses to Plaintiff's Requests for Admissions again denied copying their tables from *The Medicaid Trap.* Only at the hearing did Defendant Gordon finally admit that he repeatedly made misrepresentations to the Plaintiff and the Court and that the Defendants' Tables, in fact, were copies of the Plaintiff's Tables.

54. The Defendants' Tables are an integral, substantial and material part of *Life Savings I.* The Defendants' Tables are referred to fifteen (15) times in the text of *Life Savings I,* often introduced by statements that the reader should "Be sure to refer to the tables .." or equivalent language, and Gordon admitted that the Defendants' Tables are important to *Life Savings I.* Similar references to Defendants' Revised Tables appear in *Life Savings II.*

Defendants have highlighted the existence of the Revised Defendants' Tables in the *Life Savings II* by announcing their presence with a sunburst on the cover of the book, which further demonstrates the importance of the tables.

55. Defendants did not have Budish's authorization to copy his Tables and/or his book, or to produce a derivative work based on his Tables.

56. The organization and structure of *Life Savings I* bear some similarities to *The Medicaid Trap.*

57. A review of other works discussing Medicaid Planning demonstrates that the use of tables, generally, and tables including the information as created by Budish, is not mandated by the subject matter.

### H. *Life Savings II*

58. Defendants have prepared a revised version of *Life Savings I,* which shall be referred to as *Life Savings II.*

59. *Life Savings II* was published in early September, 1991, only weeks before the preliminary injunction hearing.

60. The errors in the physical layout of *Life Savings II* evidence Defendants' haste in publishing *Life Savings II.*

61. The revisions made to the text and tables in *Life Savings II* were clearly an attempt by Defendants to avoid liability for their infringement.

62. The timing of publication of *Life Savings II,* coupled with the evidence of Defendants' haste in publishing and Defendants' efforts to delay the hearing of this matter, support a finding that the Defendants published *Life Savings II* at this time in an attempt to avoid a preliminary injunction in this action.

63. Defendants have added textual material to *Life Savings I* in *Life Savings II.* Defendants admit that they have not made any significant changes to the text of *Life Savings I* or deleted text from *Life Savings II* that was in *Life Savings I.* At best, *Life Savings II* is a derivative work, prepared from an infringing copy (*Life Savings I*), of *The Medicaid Trap,* without Budish's permission or authorization; *Life Savings II* remains a copied infringing work.

64. The Defendants have made changes to their Tables in *Life Savings II.* The changes were clearly made in an attempt to avoid a preliminary injunction in this case. While the Defendants have omitted Defendants' Table 5 from the original version, the changes to the other tables are obvious attempts to mask the copying of the Plaintiff's Tables in *Life Savings I,* while carrying forward those tables into *Life Savings II.* For instance:

(a) Defendants changed Table 2 in *Life Savings II* by omitting Budish's footnote and paraphrasing of the language of the title of Original Chart 5 in an attempt to mask infringement. Defendants' Revised Table 2 is substantially similar to Plaintiff's Table 5.

(b) Defendants changed their Revised Table 3 in *Life Savings II* by merging Plaintiff's Tables 6 and 7 into a single chart and by paraphrasing the titles; Defendants' Revised Table 3, along with their Revised Table 2, continue to copy Budish's dividing of this factual information based on the existence of an income limit. The change to Defendants' Revised Table 3 is not substantial and Revised Table 3 remains substantially similar to Plaintiff's Tables 6 and 7.

(c) Defendants changed their Revised Table 4 by paraphrasing the title. Defendants' Revised Table 4 is substantially similar to Plaintiff's Table 8.

(d) Defendants changed Revised Table 6 by paraphrasing the title. Defendants' Revised Table 6 is substantially similar to Plaintiff's Table 10.

(e) Defendants changed Revised Table 7 by paraphrasing the title and column headings in Plaintiff's Table 11; substituting explanatory footnotes; and changing "x's" to check marks and the word "no" to "none" in the text of the table. An earlier draft of Defendants' Revised Tables, which indi-

cates that these changes were made at the last minute, provides further evidence that Defendants' revisions are an attempt to mask the copying of Plaintiff's Table 11. Defendants' Revised Table 7 is substantially similar to Plaintiff's Table 11.

(f) Defendants changed Revised Table 8 by paraphrasing the title of Plaintiff's Table 12; including all states; deleting two columns; reversing the order of the columns for autos and rings; changing the word "car" to "autos" in the column heading; and substituting footnotes. Defendants' Revised Table 8 is substantially similar to and is derived from Plaintiff's Table 12.

These changes are an obvious attempt to mask the taking of the Plaintiff's Tables.

65. Although the Defendants' Revised Tables are no longer identical to the Plaintiff's Tables, they are substantially similar to and *derived from* Plaintiff's Tables.

## I. Defendants' Estoppel Defense

66. Below each of Plaintiff's Tables is the statement "SOURCE: National Governors' Report." In the "Acknowledgments" section of *The Medicaid Trap*, Budish wrote, "In the book are frequent references to a report prepared by Edward Neuschler for the National Governors' Association. That report contains a wealth of information, and I appreciate Mr. Neuschler's and the National Governors' Association's permission to provide portions of it to you." (Plaintiff's Exh. 1, at 232).

67. Although Gordon now claims he relied on the source notes and the Acknowledgment statement as a disclaimer by Plaintiff of any protectible interest in Plaintiff's Tables, during the early part of this litigation Gordon maintained that in writing his book he did not use Plaintiff's book at all, but rather he used the Governors' Report itself as the source for his tables. This evidence alone demonstrates that there was no reliance on the source notes or Acknowledgment.

68. The source references and Acknowledgment statement, by themselves, do not

demonstrate that Budish intended to disclaim any protectible interest in his Tables.

## J. Defendants' Fair Use Defense

69. Defendants contend that the doctrine of "fair use" protects and sanctions their taking of the Plaintiff's Tables through the Defendants' Tables in *Life Savings I*. Defendants' verbatim taking of the Plaintiff's Tables, which are a qualitatively substantial and material part of *The Medicaid Trap*, was commercially motivated.

70. The factual basis for criteria that must be established to find "fair use" have not been demonstrated in this case.

## K. Defendants' Benefits from *Life Savings I*

71. Defendants have marketed, promoted, distributed and sold *Life Savings I* nationally and in the Northern District of Ohio.

72. Defendants have sold more than 100,000 copies of *Life Savings I*, making a net profit of approximately $300,000.

73. As of the date of this hearing, *Life Savings I* was being sold in bookstores in the Northern District of Ohio. (Plaintiff's Exh. 104).

74. Defendant Gordon has used *Life Savings I* and will use *Life Savings II* to attempt to establish/enhance his reputation as the allegedly leading national expert on Medicaid Planning.

75. Defendant Gordon has used *Life Savings I* and will use *Life Savings II* to obtain speaking engagements, interviews and writing opportunities.

76. Defendant Gordon has used *Life Savings I* in a direct attempt to obtain Budish's *Family Circle* writing assignment. (*See* Plaintiff's Exh. 94).

77. Defendant Gordon has used *Life Savings I* and will use *Life Savings II* to further his legal practice.

78. Defendants offer (for a fee) to provide elder law attorney referrals to readers of *Life Savings II* through the use of a "referral form" located in the back of *Life*

*Savings II.* Through the use of this referral service, Defendants are directly competing with Budish's legal business.

### L. Budish's Irreparable Harm

79. Budish first obtained a copy of *Life Savings I* in December of 1990.

80. After reviewing *Life Savings I,* Budish felt that his copyright had been infringed and sought the advice of legal counsel concerning the infringement.

81. After obtaining the advice of counsel and obtaining counsel to prosecute this action, Budish filed this action in May of 1991.

82. Budish diligently pursued this matter once he ascertained the nature of his claims, and filed this action in a prompt manner.

83. Budish and Gordon are in direct competition with each other with respect to selling their respective books and in attempting to establish themselves as the national leader in the area of Medicaid Planning.

84. Defendants have been marketing and promoting *Life Savings I* as an original work authored by Defendant Gordon with Defendant Daniel without acknowledging that *Life Savings I* contains substantial protected expression taken from *The Medicaid Trap.*

85. As a result of Defendant Gordon's use of *Life Savings I* and *Life Savings II,* which infringes Budish's copyright, and Defendants' passing off *Life Savings I* as an original work despite the infringement, to enhance Defendant Gordon's reputation, Budish has lost and will lose speaking and writing opportunities and other opportunities to enhance his reputation.

86. As a result of Gordon's use of *Life Savings I* and *Life Savings II* and Defendants' passing off *Life Savings I* as an original work despite the infringement in order to enhance Gordon's reputation, Budish has lost and will lose opportunities to further his legal practice.

### M. Balance of the Hardships

87. The only harm Defendants will suffer as a result of an injunction in this matter is the potential lost profits from the sale of the infringing books.

88. Defendants rushed to print and publish *Life Savings II* with the knowledge of this lawsuit and Budish's request for injunctive relief. Any hardship that could result from entry of a preliminary injunctive was assumed as a risk by Defendants in their publication of their revised edition.

### N. The Impact on the Public Interest

89. The copyright laws are designed to serve the public interest by protecting the exclusivity of copyright material and discouraging theft.

90. The public interest favors the granting of injunctive relief when a Plaintiff demonstrates a likelihood of success in establishing copyright infringement.

91. Defendants have failed to show how the public interest would be better served by allowing Defendants to continue to publish, market and sell *Life Savings I* and *Life Savings II* at the expense of Budish's copyright in *The Medicaid Trap.*

## II. CONCLUSIONS OF LAW

██ On a motion for a preliminary injunction, the Court is to consider four factors:

(1) the likelihood of success on the merits of the action; (2) the irreparable harm that could result if the court did not issue the injunction; (3) the impact on the public interest; and (4) the possibility of substantial harm to others.

*Forry, Inc. v. Neundorfer, Inc.,* 837 F.2d 259, 262 (6th Cir.1988). These factors are to be balanced; none is a prerequisite. *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir.1985). The relative strength of one or more factors can offset the weakness of another, even if the weak factor is the likelihood of success. *Id.* at 1229, 1230.

The Court will discuss how the facts of this case affect each of the four factors.[4]

---

**4.** Since the focus of the injunction hearing was the copyright claim, the Court's Conclusions of Law address only that claim.

**1332**

## A. Likelihood of Success

In order to prove a case of copyright infringement, the Plaintiff must show (1) his ownership of a valid copyright, and (2) copying by the Defendants of protectible expression. *See Wickham v. Knoxville Int'l Energy Exposition, Inc.*, 739 F.2d 1094 (6th Cir.1984). In this case, since Plaintiff presented his copyright at the hearing, *see* Finding of Fact No. 42, he has established *prima facie* ownership of the copyright in *Medicaid Trap*. Defendants have not presented evidence to rebut Plaintiff's ownership and the validity of the copyright. The second element—copying by the Defendants—is composed of two sub-elements, (1) whether there is protectible expression, and (2) whether the Defendants copied that expression. Both of these are examined below.

### 1. Protectible Expression

As noted above, the Court instructed the parties to focus on the Tables that are contained in each book. Thus, the Court's discussion of protectible expression relates to those Tables. In the very recent case of *Feist Publications, Inc. v. Rural Telephone Service Co.*, —— U.S. ——, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), the Supreme Court discussed in great depth the concept of protectible expression in the context of compilations of data. In *Feist*, the respondent claimed that it had a protectible interest in its compilation of names, addresses, and telephone numbers which it published in an annual directory. Thus, as in this case, the Court had before it a situation in which a party sought the protection of the copyright laws for a compilation of facts.

The *Feist* opinion began with the well-grounded proposition that although facts themselves are not copyrightable, compilations of facts are. 111 S.Ct. at 1287. For a compilation to be copyrightable, three elements must be met:

(1) the collection and assembly of pre-existing material, facts, or data; (2) the selection, coordination, or arrangement of those materials; and (3) the creation,

by virtue of the particular selection, coordination, or arrangement, of an "original" work of authorship.

111 S.Ct. at 1293. The key in applying these elements, as the Court pointed out, is determining "whether the selection, coordination, and arrangement are sufficiently original to merit protection." *Id.* at 1294.

It is clear that "the *sine qua non* of copyright is originality. To qualify for copyright protection, a work must be original to the author." *Id.* at 1287. The Court made it clear in *Feist* that meeting the test of originality is not difficult.

Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity.... To be sure, the requisite level of creativity *is extremely low; even a slight amount will suffice.* The vast majority of works make the grade quite easily, as they possess *some creative spark, "no matter how crude, humble or obvious"* it might be.

*Id.* at 1287 (emphasis supplied). Later, the Court stated, "Originality requires only that the author make the selection or arrangement independently (*i.e.,* without copying that selection or arrangement from another work), and that it display some minimal level of creativity." 111 S.Ct. at 1294. Finally, the Court noted that "the selection and arrangement of facts cannot be so mechanical or routine as to require no creativity whatsoever." *Id.* at 1296.

The Defendants contend that Plaintiff's Tables contain no protected expression. (Defendants' Brief in Opposition to Plaintiff's Motion for Preliminary Injunction (Corrected), at 15). In light of the language of the Supreme Court in *Feist*, such an argument cannot be maintained. Although Plaintiff's Tables are composed almost entirely of pre-existing material—most of which came from the Governor's Report—Plaintiff clearly selected and arranged the material for his Tables in an original manner. Even a cursory compari-

son of Plaintiff's Tables and those in the Governor's Report demonstrates how Plaintiff chose pertinent data and discarded what he felt was unnecessary data to create his own original Tables.

This latter consideration—what Plaintiff left out in creating his Tables—is an important factor. For example, in *Financial Information, Inc. v. Moody's Investors Service, Inc.*, 751 F.2d 501, 507 (2d Cir. 1984), the court stated that in determining the degree of selectivity exhibited by a particular compilation, the trial court should consider what other facts could be included or might have potential value to a purchaser of the compilation. Likewise, in the present case, as the testimony clearly demonstrated, there are many categories of data that have potential use to purchasers of the parties' books that could have been included in a variety of combinations of tables or charts. Plaintiff included some, excluded others, and arranged the ones he felt were important into his Tables. The cluttered tables in the Governor's Report appear nothing like Plaintiff's final Tables, and clearly it was Plaintiff's selectivity that made the difference.[5] Based on the foregoing, the Court concludes that the Plaintiff Budish's Tables contain protectible expression.

### 2. Copying

Obviously, Plaintiff may prove copying by demonstrating that Defendants took his protected expression verbatim. This is not the only method of proving copying, however. Plaintiff may also show that the Defendants had access to his work and that they produced a work which is substantially similar to his. *Wickham v. Knoxville Int'l Energy Exposition, Inc.*, 739 F.2d 1094, 1097 (6th Cir.1984); *accord M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 445 (4th Cir.1986).

With respect to Defendants' tables in *Life Savings I*, it is clear that those tables were taken verbatim from *The Medicaid Trap*. Defendant Gordon admitted as much on the witness stand. Thus, it is clear that the Plaintiff has proven copying of the tables in Defendants' first book.

The Tables in the Defendants' second book are not verbatim copies of Plaintiff's Tables. Thus, the Court must determine if the Plaintiff is likely to be able to prove access and substantial similarity. As the Court concluded above, Gordon admitted that the Defendants had access to Plaintiff's book at the time they wrote *Life Savings I*, which establishes their access in writing *Life Savings II*. The remaining issue is whether the Tables in *Life Savings II* are substantially similar to Plaintiff's Tables.

As a starting point, it is important to recognize that in order to prove substantial similarity between Plaintiff's Tables and Defendants' Tables it is not necessary for Plaintiff to prove that the compilations are identical. The Second Circuit has made it clear that this is so, even after *Feist*. In *Key Publications, Inc. v. Chinatown Today Publishing Enterprises, Inc.*, 945 F.2d 509 (2d Cir.1991), the court held:

> [O]ne might interpret *Feist* to permit a finding of infringement only when a subsequent compiler produces an exact replica of a copyrighted compilation....

> We have not read *Feist* in such a broad and self-defeating fashion. *See Kregos v. Associated Press* [2nd Cir.], 937 F.2d 700, 703–04. Such a reading of *Feist* would allow subsequent compilers to avoid infringement suits simply by adding a single fact to a verbatim copy of the copyrighted compilation, or omitting in the copy a single fact contained in the copyrighted compilation. Such a result would render the copyright of a compilation meaningless. While, as the Court pointed out in *Feist*, the "copyright in a factual compilation is thin," 111 S.Ct. at 1289, we do not believe it is anorexic.

---

5. Defendants' contention that Plaintiff's selection and arrangement is somehow inevitable or the only way the information could have been presented also fails. Once again, a brief comparison of Plaintiff's Tables and those in the Governor's Report clearly demonstrates this.

Further supporting this conclusion was the testimony of Alexander Bove, Jr., Defendants' expert, who indicated that the information about differences in state law could even be presented in the text or by use of lists.

945 F.2d at 514 (parenthetical and citations omitted). This Court finds the Second Circuit's interpretation of *Feist* to be both sound and fully consistent with the *Feist* opinion taken as a whole.

Defendants' Tables in *Life Savings II* are substantially similar to Plaintiff's Tables. As noted above in the Findings of Fact, there are some minor changes from the Tables in *Life Savings II*. Nevertheless, the Defendants' Tables continue to use the Plaintiff's selection and arrangement of items.

In addition, although Gordon contends that in assembling his charts for *Life Savings II* he started anew—that he gathered the raw data and constructed the charts from that data—since Gordon admitted the slavish copying of Plaintiff's Tables in writing *Life Savings I*, the Court rejects this contention as hollow, self-serving testimony.[6] Furthermore, the Court's finding that Gordon copied the Plaintiff's Tables for *Life Savings I* is highly relevant in determining whether there was copying of the Tables for *Life Savings II*. As this Court noted in *Forry v. Neundorfer*, No. C87-478, 1987 U.S. Dist. LEXIS 3320 (1987), *aff'd*, 837 F.2d 259 (6th Cir.1988), the fact that the challenged work has been derived from an admittedly copied work tends to show copying in the derived work and is itself an independent violation of copyright law. *See also* 17 U.S.C. § 106. Thus, Plaintiff has shown that the Defendants copied his Tables for *Life Savings II*.

 Defendants contend that even if Plaintiff succeeds in showing copying, he cannot show a likelihood of success on the merits because Plaintiff's Tables "constitute[ ] at best a de minimis part" of the books. (Defendants' Brief, at 54). The Court rejects this argument. It is clear that the Tables are central to *The Medicaid Trap*, *Life Savings I*, and *Life Savings II*. First, each of the books is marketed to a national audience, but Medicaid law varies from state to state. Thus, for a text to be successful it must effectively address state law differences. Plaintiff's book clearly does this through the use of the Tables, which the Defendants have copied. Second, in *Life Savings II* there are numerous references to the Tables. *See* Finding of Fact No. 54; *see generally Life Savings II*. Third, on the cover of *Life Savings II*, there is a sunburst containing the words "NEW Edition State–By–State UPDATE," which clearly draws attention to the Defendants' Tables. In sum, it is no overstatement to call the Tables "the heart" of these books. All of the text provides helpful guidance, but unless the reader is provided with the law of his particular state in an easy-to-understand format, the book fails to perform the function it was created to perform, *viz.*, educate the purchaser about Medicaid law in his own state, regardless of the state in which he lives. Thus, not only have the Defendants copied from Plaintiff's book, they copied a legally "substantial" portion of Plaintiff's book.

### 3. Fair Use

 Defendants assert the defense of fair use to Plaintiff's copyright claim. The factors to be weighed regarding fair use were set out by the Supreme Court in *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 560–61, 105 S.Ct. 2218, 2230–31, 85 L.Ed.2d 588 (1985):

(1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the substantiality of the portion used in relation to the copyrighted work as a whole; (4) the effect on the potential

---

**6.** In addition, the Court makes all credibility determinations against Gordon, since his testimony at the injunction hearing directly contradicted statements he made in two separate declarations made under penalty of perjury. On the witness stand during the hearing Gordon admitted that he had copied Plaintiff's Tables verbatim for *Life Savings I*. Yet in his Declaration of May 10, 1991, Gordon averred that *Life Savings I* was "an entirely original work of authorship," and that his charts are derived from "public sources." (Gordon Decl., ¶ 7). In his Declaration of September 17, 1991, Gordon averred, "Jane Daniel and I made no use of the Budish book in connection with our preparation or editing of the text for Gordon (1st ed.)." (Gordon Decl., ¶ 13). Obviously, Gordon's sworn testimony at the hearing and those declarations made under penalty of perjury could not both be true.

market for or value of the copyrighted work.

These factors, as they relate to the present case, weigh heavily against a finding of fair use. Initially, as the Court made clear in *Harper & Row*, use of the copyrighted material for a commercial purpose by the party claiming the defense of fair use weighs against that defense. *Id.* at 562, 105 S.Ct. at 2231. "Every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Id.* at 562, 105 S.Ct. at 2231.[7] Second, as in *Harper & Row*, this Court has concluded that the Defendants copied what amounts to "the heart" of Plaintiff's book, the Tables.

Finally, the "single most important element of fair use" is the effect of the use on the potential market for the copyrighted work. *Id.* at 566, 105 S.Ct. at 2233. In the present case, the Defendants' use of Plaintiff's Tables enables them to have easy reference to the state law differences that are critical in books of this nature. This makes Defendants' book more competitive in the market for potential consumers. As the Supreme Court noted, "[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." *Id.* at 568, 105 S.Ct. at 2234 (emphasis in original; internal quotations omitted). This consideration, and the Court's conclusions on the other factors, all indicate that Defendants' claim of fair use must be rejected.[8]

### 4. Estoppel

■■■ Defendants also contend that Budish is estopped from suing for infringement of the Tables because of his source notes and the Acknowledgment he included to the National Governors' Association and Edward Neuschler, the creator of the Governors' Report tables. (*See* Finding of Fact No. 66). The Court disagrees.

The parties agree that in order to prove estoppel in a copyright case, the party asserting the defense must show each of the following:

(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir.), *cert. denied*, 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960); *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F.Supp. 531, 535 (S.D.N.Y.1977), *aff'd*, 592 F.2d 651 (2d Cir.1978). Even if the Defendants could prove the first three of these elements, which they have not, the Court would still reject their estoppel defense. The Defendants' assertion that they reasonably relied on Plaintiff's statement of acknowledgment cannot be maintained after they first claimed they never used Plaintiff's book at all in preparation of their books, but now admit that they copied Plaintiff's Tables for use in *Life Savings I.* Such misrepresentations demonstrate the Defendants' attempts to manipulate the facts to complement whatever legal theory is most convenient at the moment. Since detrimental reliance is a key element of estoppel, *Broadcast Music, Inc. v. Peppermint Club*, 229 U.S.P.Q. 534, 536 (N.D.Ohio 1985), the Defendants' effort to assert this defense fails.[9]

---

**7.** The Court also stated, "Fair use distinguishes between a true scholar and a chiseler who infringes a work for personal profit." *Id.* at 563, 105 S.Ct. at 2232.

**8.** As the Supreme Court noted in *Harper & Row*, fair use is an equitable doctrine. The Defendants' misrepresentations to the Court, *see supra* note 6, may preclude their assertion of such a defense, in any event.

**9.** In addition, the defense of equitable estoppel can be defeated if the party to be estopped can show that the party asserting estoppel has "engaged in particularly egregious conduct which would change the equities in plaintiff's favor." *TWM Mfg. Co. v. Dura Corp.*, 722 F.2d 1261, 1268 (6th Cir.1983). Plaintiff's evidence in the present case shows that he is very likely to be able to prove that Gordon's conduct was sufficiently egregious to undermine the estoppel de-

**5. Copyright Misuse Theory**

Defendants assert that Plaintiff is precluded from proceeding with his claim of copyright infringement because he has engaged in activity that constitutes misuse of his copyright. Defendants cite *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970 (4th Cir.1990), in support of their argument. This defense has not been recognized by the Sixth Circuit, nor has it been rejected by that court. Thus, this Court is not limited in its treatment of the defense.[10]

In *Lasercomb*, the court held that the misuse defense would apply not only when a copyright holder used its copyright to violate antitrust laws, but also whenever the "copyright is being used in a manner violative of the public policy embodied in the grant of a copyright." 911 F.2d at 978. The court made it clear that the misuse defense is "equitable" in nature. *Id.*

In the present case, it is unnecessary to decide whether or not to recognize the misuse defense since the facts of this case, as presented, do not preclude Plaintiff from bringing this action and do not affect his likelihood of success on the merits. The basis for the Defendants' assertion of misuse is the Joint Motion of Plaintiff and Defendant Malrite Communications Group, Inc., to Enter Order (Docket No. 64), and the apparent agreement between Plaintiff and Malrite that it memorializes. The proposed order would enjoin Malrite from "broadcasting, either by itself or by a network, any advertisements or promotions for *any* version of the book *How to Protect Your Life Savings from Catastrophic Illness and Nursing Homes.*" (emphasis supplied). This order (and agreement) would extend to Plaintiff protection beyond that which he is entitled to under copyright law. First, the plain language of the order would preclude advertising for any version of Defendants' books, even ones that do not infringe Plaintiff's copyright. Second, even if the order and agreement were construed to cover only infringing versions of Defendants' books, the agreement apparently was entered into and the order was jointly requested even before this Court found copyright infringement and thus it seeks greater rights than are provided for under copyright law.[11]

The agreement, however, does not rise to the level of misuse that is contemplated by the cases which recognize the defense. For example, in *Lasercomb*, the Plaintiff's licensing agreement forbade licensees from developing or assisting in developing any kind of computer assisted die-making hardware for 99 years, 911 F.2d at 978, which the court characterized as "egregious" action. *Id.* at 979. The court in *National Cable Television Ass'n, Inc. v. Broadcast Music, Inc.*, 772 F.Supp. 614 (D.D.C.1991), noted that the burden of the party asserting misuse is "great," and that if no antitrust violation is proven the party must show the copyright holder "somehow illegally extended its monopoly or otherwise violated the public policy underlying copyright law." *Id.* at 652. In the present

---

fense. *See* Finding of Fact No. 53; *see also supra* note 6.

**10.** Several courts have rejected the defense, *Service & Training, Inc. v. Data General Corp.*, 737 F.Supp. 334 (D.Md.1990) (and cases cited therein); *Rural Telephone Service Co. v. Feist Publications, Inc.*, 663 F.Supp. 214 (D.Kan.1987) (citing cases), *aff'd*, 916 F.2d 718 (10th Cir.1990) (table), *rev'd on other grounds*, —— U.S. ——, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *see also BellSouth Advertising & Publishing Corp. v. Donnelley Information Publishing Inc.*, 719 F.Supp. 1551 (S.D.Fla.1988), *aff'd on other grounds*, 933 F.2d 952 (11th Cir.1991), while others have recognized it, *Lasercomb*, 911 F.2d 970; *National Cable Television Ass'n, Inc. v. Broadcast Music, Inc.*, 772 F.Supp. 614, 651–52 (D.D.C.1991) (and cases cited therein); *Oad., Inc. v. ALN Associates, Inc.*, 770 F.Supp. 1261, 1265–70 (N.D.Ill. 1991); *see also Coleman v. ESPN, Inc.*, 764 F.Supp. 290, 295 (S.D.N.Y.1991) (indicating that trend in the law is toward recognition of the defense).

**11.** The Court notes that copyright misuse is an equitable defense, and it is clear that once again in this case the equitable considerations are squarely against the defendants. The role of these defendants' local counsel (the law firm of Benesch, Friedlander, Coplan & Aronoff) in negotiating the agreement on behalf of defendant Malrite is significant. However, the Court will not, on the state of the record at this point, hold as a matter of law that the defendants are precluded from asserting the defense because of unclean hands.

case, there is no evidence that Malrite had ever advertised or been requested to advertise Defendants' books. And, in light of this Court's findings of infringement, an order enjoining Malrite from advertising *Life Savings I* and *Life Savings II* would certainly be appropriate. Therefore, copyright misuse will not preclude the Plaintiff from enforcing his copyright against these Defendants.[12]

### 6. Summary and Conclusion

The Plaintiff has demonstrated a substantial likelihood of success on the merits. He has shown that his Tables contain protectible expression and constitute copyrightable compilations. His Tables have an original selection and arrangement of data. Plaintiff has also demonstrated that the Defendants' first book incorporated his Tables verbatim, and that the Tables in Defendants' second book are substantially similar to Plaintiff's Tables. Access having also been shown, Plaintiff has proved the requisite elements of copyright infringement. The Defendants have raised several defenses, none of which is likely to prevent Plaintiff from succeeding on the merits of his copyright claim. Thus, these defenses do not affect the Court's conclusion regarding Plaintiff's likelihood of success.

### B. Irreparable Harm

A plaintiff in a copyright infringement action establishes a rebuttable presumption of irreparable harm by showing that his valid copyright has been infringed. *Forry, Inc. v. Neundorfer, Inc.*, 837 F.2d 259, 267 (6th Cir.1988). Defendants offer three arguments to support their claim that they have rebutted the presumption of irreparable harm. First, they assert that as to *Life Savings I*, the motion for injunction is moot since it is no longer being published. The Court disagrees. The evidence showed that at the time of the hearing, there were copies of the book on the shelves of bookstores within this District, demonstrating that the book is at least still being distributed commercially. Defendants' mootness argument is considerably weakened by this evidence.

Second, Defendants contend that Plaintiff delayed unreasonably in bringing this lawsuit, thereby undermining his claim that he will suffer irreparable harm. This argument must also be rejected. Plaintiff testified that he first read Defendants' book in December 1990, and very shortly thereafter sought the advice of an attorney in his law firm. He and his firm spent time investigating the expense of bringing the litigation, investigating the merits, and then seeking outside counsel. Plaintiff also prepared an extensive memorandum (which was the subject of an earlier Memorandum Opinion and Order of this Court) related to the merits of this case. The complaint in this case was filed on May 7, 1991. Plaintiff did not unreasonably delay in bringing this suit. *See Forry*, 837 F.2d at 267 (delay of 20 months not unreasonable delay).

Third, Defendants contend that money damages are an adequate remedy, and therefore no irreparable harm has been established. The Defendants' argument that Plaintiff's damages are easily calculable is not well-taken. The Defendants and Plaintiff sell competing books and are engaged in competing legal businesses that are intertwined with those books. Defendants' books, however, infringe Plaintiff's copyright. Under these circumstances, if the Defendants are permitted to continue marketing and selling their book, there is no reasonable manner for Plaintiff to prove how many sales he lost because of the presence of Defendants' books on the market. Thus, this final argument also fails.

---

**12.** As noted above, the apparent agreement and proposed order submitted by plaintiff are overly broad. However, it is clear that plaintiff is not precluded from enforcing his copyright if he purges himself of any alleged misuse. Plaintiff has sought to do just this by contingently moving to withdraw the joint motion to enter order and to withdraw the proposed settlement with Malrite. Because this area of the law is unsettled, the Court will grant plaintiff's motion to withdraw, thereby purging what might be construed as misuse by the plaintiff. If plaintiff and Malrite wish to submit an alternative order, they may do so.

**1338**

Therefore, the Plaintiff has sufficiently demonstrated that he will suffer irreparable harm if an injunction is not issued.[13]

### C. Public Interest

It is in the public interest to protect the rights of copyright holders.

> Since Congress has elected to grant certain exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work.

*Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983), *cert. dismissed*, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984) (quoting *Klitzner Industries, Inc. v. H.K. James & Co.*, 535 F.Supp. 1249, 1259–60 (E.D.Pa. 1982)); *accord Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir.1988). In the present case, where Plaintiff has demonstrated a substantial likelihood of showing that his copyright has been infringed, the public interest factor weighs in favor of granting the injunction.

### D. Balance of the Equities

Defendants contend that equitable considerations weigh against an injunction. Essentially, they assert that they have built a strong business through sales of *Life Savings I* and *Life Savings II*. However, "Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration.'" *Concrete Machinery*, 843 F.2d at 612; *see also Forry v. Neundorfer*, No. C87–478, 1987 U.S.Dist. LEXIS 3320 (1987), *aff'd*, 837 F.2d 259 (6th Cir.1988). Thus, the Court can and does summarily reject Defendants' argument. The balance of the equities in the present case clearly favors granting the injunction.

### III. CONCLUSION

 The Court having concluded that each of the relevant factors weighs in favor of the injunction, the Court will GRANT Plaintiff's motion for a preliminary injunction.

 The Defendants correctly note that the Court must consider the issue of a bond to accompany the injunction and that there is a presumption in favor of requiring a bond. *See* Fed.R.Civ.P. 65(c). The Defendants request that a bond be set at $3 million to accompany any injunction. Like the entry of the injunction, however, the setting of a bond is subject to equitable considerations. In the present case, these considerations militate against a high bond. The Defendants continued with the process of preparing a second edition of their book (*Life Savings II*) even after this suit was filed, and ordered 100,000 copies of their book to be printed. *Life Savings II* was placed on the market just a few weeks before the commencement of the preliminary injunction hearing in this case. The Defendants having done this, already knowing that Plaintiff was seeking injunctive relief against their first book, they shall not be heard to complain that they may lose the profits from the sale of those 100,000 books. In addition, the Defendants' assertion that this matter could be pending for four or five years before it comes to trial is mere speculation and will not serve as the basis for setting a high bond.

In the exercise of its discretion, the Court orders that the bond in this case be set at $50,000.

IT IS SO ORDERED.

---

**13.** In addition to the legal presumption of irreparable harm, the evidence at the hearing showed that Defendant Gordon's reputation in the field of Medicaid law has grown because of his books. Both the fact that Plaintiff and Defendant Gordon compete for television and radio appearances related to this area of the law, and the fact that Defendants' books infringe Plaintiff's copyright show that Defendant Gordon is building his reputation at least in part on Plaintiff's work. This shows that Plaintiff will continue to suffer irreparable harm if the Defendants are not enjoined from further copyright violations.